PALILA (Loxioides bailleui, formerly Psittirostra bailleui), an endangered species; Sierra Club, a non-profit corporation; National Audubon Society, a non-profit association; Hawaii Audubon Society, a non-profit association; and Alan C. Ziegler, Plaintiffs,

v.

HAWAII DEPARTMENT OF LAND AND NATURAL RESOURCES; and Timothy E. Johns, in his capacity as Chairman of the Hawaii Board of Land and Natural Resources, Defendants,

and

Sportsmen of Hawaii, Inc.; Hawaii Island Archery Club; Hawaii Rifle Association; Gerald Kang; Kenneth Funai; John Wong; and Irwin Kawano, Defendants–Intervenors.

No. Civ. 78–0030.

United States District Court,
D. Hawaii.

Oct. 13, 1999.

Paul H. Achitoff, Earthjustice Legal Defense Fund, Honolulu, HI, for plaintiffs.

Michael Q.Y. Lau, Deputy Attorney General, Earl Anzai, Attorney General of Hawaii, Department of the Attorney General, State of Hawaii, Honolulu, HI, for defendants.

John S. Carroll, Honokaa, HI, for defendant-intervenor, Sportsmen of Hawaii, Inc. and Amicus Curiae Wildlife Conservation Association of Hawaii.

DECISION AND ORDER

SAMUEL P. KING, Senior District Judge.

The Palila (*Loxioides bailleui*, formerly *Psittirostra baillieui*) is high on the

worldwide list of endangered species. The Palila was listed as an endangered species by the Secretary of the Interior in 1967, 32 Fed.Reg. 4001 (1967), and it still remains on the list of endangered species. 50 C.F.R. § 17.11 (1999).

The natural and only habitat of this Hawaiian honey-creeper today is a small area on the upper slopes from approximately 6000 feet to 9400 feet of 13,825–foot high Mauna Kea on the island of Hawaii. This area is about 10% of the bird's historical range. When first officially identified in 1876, Palila lived only on the island of Hawaii but was common in north and south Kona and on the slopes of Mauna Kea in the Hamakua and Hilo Districts. By 1894, the birds were no longer found in Kona. Much of the extirpation may have resulted from avian malaria carried by mosquitoes whose population increased rapidly with ranching activities in the late nineteenth century.

By the mid-twentieth century, the Palila's range had shrunk to its present area, largely due to habitat destruction from grazing ungulates (hoofed animals). Feral (wild) cattle, horses, sheep and pigs were established on Mauna Kea by the early 1800s. The feral cattle and horses were removed in the 1920s and 1930s, and feral pigs do not appear to have had a significant adverse effect on the Palila's habitat. Feral goats appeared in some numbers in the 1930s, and mouflon sheep were introduced in 1963. An estimated 40,000 sheep roamed the mountain in 1936. In the 1960's and 1970's, the state maintained feral sheep numbers for sport hunting at about 3,000–4,000 animals.

The Palila is totally dependent on the mamane and mamane-naio forests for its existence. The bird's preferred food is the pod of the mamane tree (*Sophoro crysophylla*), but it will also eat mamane flowers, buds, and leaves, and berries of the naio tree (*Myoporum sandwicense*), and sometimes insects when mamane pods are scarce. The bird also depends upon the mamane for shelter and nesting sites.

The feral goats and sheep had a devastating effect on the mamane forest. In 1977, the U.S. Fish and Wildlife Service officially designated the Palila's critical habitat as a 200 sqkm ring around the upper slopes of Mauna Kea. 50 C.F.R. § 17.95 (1999). This area contains the entire known population of Palila and essentially encompasses the existing mamane and mamane-naio forests on Mauna Kea and is the remaining 10% of the Palila's historical range.[1] The U.S. Fish and Wildlife Service in its 1986 recovery plan for the Palila gave as the primary reasons for listing the Palila as an endangered species not only the bird's low population but also that a significant portion of its historical range was no longer occupied by the Palila and that its then habitat was being adversely modified by feral ungulate browsing.

Believing that the Hawaii Department of Land and Natural Resources (DLNR) was violating the Endangered Species Act, the Palila and its supporters brought suit to require the removal of the goats and sheep from the Palila's critical habitat. That action resulted in an order filed August 1, 1979, so requiring except that it was limited to feral goats and feral sheep. *Palila v. Hawaii Dep't. of Land and Natural Resources*, 471 F.Supp. 985 (D.Haw.1979) (Palila 1).

At the time Palila 1 was being litigated, Jon G. Giffin, Wildlife Biologist in the Division of Forestry in the DLNR, was studying mouflon sheep and their impact on the critical habitat of the Palila. In deference to Mr. Giffin, and the claims of hunters that mouflon sheep did not present the same potential for harm to the Palila's critical habitat as did the feral sheep, the then plaintiffs specifically excluded mouflon sheep from their prayers for relief.

---

1. Mamane trees exist elsewhere on the island of Hawaii, especially a fairly extensive mamane forest near Pohakuloa flats. There are no Palila in any of these areas. *Palila v. Hawaii Dep't. of Land and Natural Resources*, 649 F.Supp. 1070 (D.Haw.1986) (*Palila 2*).

The European mouflon (*Ovis musimon*) is a native of Corsica and Sardinia. The sheep are light tan to rich brown, with white on the tail, rump, and underparts, and they have large horns of excellent trophy quality. The State Division of Fish and Game introduced the mouflon onto Mauna Kea with the original hope that they would upgrade the existing feral sheep and modify some of their undesirable characteristics. A total of 99 hybrid and 94 pure mouflon were released between 1962 and 1966. However, the hybridization project was never completed. The pure mouflon became exceedingly popular with hunters because of its excellent sporting, meat, and trophy qualities. Therefore, to accommodate the hunters, the DLNR was maintaining a pure mouflon population within the Mauna Kea Game Management Area, which area included most of the Palila's critical habitat.

The mouflon sheep study was finally completed, and on the basis of the findings of that study the plaintiffs refiled an action similar to their earlier action but this time aimed at the mouflon sheep. Not surprisingly, the study found that pure mouflon sheep presented the same danger to the Palila's critical habitat that feral sheep or hybrid sheep did. Accordingly, this court in 1986 entered another order filed January 27, 1987, reaffirming the order of August 1, 1979, and requiring the removal of pure mouflon sheep and hybrid feral/mouflon sheep. *Palila v. Hawaii Dep't. of Land and Natural Resources*, 649 F.Supp. 1070 (D.Haw.1986) (Palila 2).

The DLNR proceeded to carry out the court's orders by a combination of staff hunting, unrestricted public hunting, and fencing. The staff hunting included contracted hunting by helicopter. In the period July 4, 1987 to December 31, 1998, a total of 4,746 animals were harvested, consisting of 1,959 feral and hybrid sheep, 2,098 mouflon sheep, and 26 goats.

The record before the court does not indicate whether feral/hybrid sheep still exist within the Palila's critical habitat in any significant numbers. An aerial survey conducted by helicopter on September 22, 1998 counted 180 sheep within the subject area. This number was not broken down as to the feral/hybrid sheep and mouflon sheep.

Goats are apparently not a problem any longer for the Palila on Mauna Kea. A July 1980 estimate of the feral goat population was less than 70. The last harvest of a goat is reported to have taken place in the period March 30–June 30, 1988. No goats are reported to have been harvested since then.

The eradication efforts pursuant to this Court's order have had measurable success in improving the Palila's critical habitat.

A comparison of photographs taken before the Court ordered eradication (prior to 1979) with those taken in recent months (1998) show extensive recovery of native vegetation. On the northern side of Mauna Kea, at the Puu Nanaha exclosure site, grasses and native shrubs have shown the greatest response to sheep removal which began about 20 years ago. Formerly barren areas are now vegetated with scattered Pukiawe (*Styphelia tameiameiae*) and grasses. Mamane recovery has been extremely slow on this side of the mountain even in exclosures that have been protected from sheep for 35 years. Mamane recovery is more dramatic, however, on the warmer western slope of the mountain. In the past, trees above along Skyline Road (above Puu Laau cabin) were frequently deformed by sheep feeding on their leaves and branches. Distinct browse lines were apparent on old mamane trees and no seedlings were able to survive. Today, the same trees have recovered their full foliage and young mamane trees are found everywhere. The wetter eastern side of Mauna Kea has also shown phenomenal forest recovery. Sheep were not removed from this area until after 1986, but the slightly moister environment has allowed rapid plant recovery. The exclosure site at Hill 8987 exhibits tremen-

dous recovery of Mamane, Pukiawe and grasses. This area was formerly barren due to high mouflon sheep numbers. Growth has been slightly slower at the Puu Kole exclosure site due to higher elevation and shifting pumice. However, mamane recovery is still significant. Aff. of Jon G. Giffin, Exh. H to DLNR's Motion to Amend.

Tension between hunter and bird arises from the fact that the Palila's critical habitat as officially designated by the U.S. Fish and Wildlife Service and the Mauna Kea Game Management Area maintained by the State of Hawaii Department of Land and Natural Resources largely overlap. Ungulate eradication efforts have become so successful that hunters frequently cannot find any sheep to shoot in the Mauna Kea Game Management Area.

As a result, opposition of hunters to the eradication program has increased as the number of sheep available to be shot has decreased. Plaintiffs allege that political pressure brought about a relaxation of eradication efforts by the Department of Land and Natural Resources. In fact, the Thirty–Ninth Status Report by the DLNR shows no staff hunting or contract shooting from July 1, 1997, through June 30, 1998. Actually, staff control and aerial surveys were halted in 1995 because of budget constraints and the lack of a state contract for helicopter rental. Aerial monitoring surveys were resumed in 1996, but staff hunting was not. Mauna Kea aerial sheep surveys were conducted every three months. There was, however, a recommencement of contract hunting from July 1, 1998, through June 30, 1999. These renewed eradication efforts seem to have energized hunters into new attempts at a political solution to their concerns.

On October 8, 1998, Governor Benjamin J. Cayetano wrote to DLNR Director Michael Wilson:

It has been brought to my attention that many people on the Big Island, particularly in Hamakua, feel their concerns regarding subsistence hunting and land use decisions have been ignored by our administration. As we discussed with the hunters during our May, 1998 field trip on the Big Island. I direct that the following be accomplished immediately. Declassification of areas presently in NARS [Natural Area Reserve System] that are not suitable for NARS classification....

Additionally, pending a discussion with the Statewide Hunter's Council on October 24, 1998, I order that the following items be put on hold:

1. The eradication of sheep on Mauna Kea.

2. ....

The eradication of sheep of [sic] Mauna Kea is scheduled in October. We are mandated by federal court to maintain a zero population of sheep in this specific area. Since the onset of this court order, about 20 years ago, we have twice appealed this decision unsuccessfully. However, we have obtained much new data over the years that provides us with new and adequate information indicating the eradication of this particular species to a zero population does more harm than good. Just as important is the issue of fairness. I believe it is time that we go back to court to appeal and correct this situation....

Exh. 1 to Achitoff Decl.

This order was withdrawn the day after Plaintiffs received a copy of the letter from the DLNR's Division of Forestry and Wildlife.

Hunters also approached Representative Patsy T. Mink with their complaint over frustrated hunting excursions and secured letters from her to Governor Benjamin Cayetano dated December 4, 1998, and to DLNR Director Michael D. Wilson dated November 28, 1998, in which she asked them to "reconsider the decision to totally eradicate sheep from Mauna Kea and all the few remaining to be retained, under control." Exhs. M–1 & M–2 to Intervenors' Motion. She wrote that "gorse infes-

tation was our primary concern." She continued:

> It seems to me that this remnant herd of 150+ should be allowed to remain. They are the best, and for the moment the only gorse control potential. As the gorse seed pods explode sending seeds into the wind, the baby seedlings that sprout are eaten by the sheep. This "natural" control must be retained if the slopes of Mauna Kea are to be saved from gorse.
>
> I see no harm in allowing this remnant of sheep to remain. Its growth could be monitored and kept at manageable numbers.

No studies have been cited as to how many sheep would be needed to control the growth of gorse. Obviously, the "remnant herd of 150+" are insufficient as "gorse infestation" is apparently proceeding apace.

Furthermore, the sheep on Mauna Kea do not limit their browsing only to baby gorse seedlings; they also devour baby mamane seedlings. The latter aspect of their appetite was an important consideration in the earlier orders for their removal. To increase the number of sheep to control gorse infestation would simultaneously endanger mamane regrowth.

While the hunters were pursuing a political solution to their complaints, Plaintiffs and Defendant DLNR were discussing implementation of the court's orders. On October 30, 1998, these parties entered into a stipulation approved by the court and filed herein on November 10, 1998, regarding future relevant activities by the DLNR. The stipulation provides:

> 1. The State will use its best efforts to minimize migration of goats, feral sheep, mouflon sheep, and hybrid mouflon/feral sheep (hereafter referred to as "ungulates"), into the critical habitat for the Palila on Mauna Kea (hereinafter "critical habitat area"). Those efforts may include but shall not be limited to: maintenance, repair, and upgrading of the forest reserve perimeter fencing, and periodical surveys to detect breaks in the fence.
>
> 2. The State will continue to implement a program of public involvement in the ungulates eradication efforts. The eradication program may include but not be limited to: reducing or eliminating public hunting bag and season restrictions, allowing the use of firearms to hunt ungulates, and guided hunts by State, and State staff hunts. The State shall have the option to continue the program already in place in part or in whole or to introduce new measures to better increase public involvement in the ungulates eradication efforts.
>
> 3. Beginning November 18, 1998, and semi-annually thereafter the State shall do aerial sightings in the critical habitat area. If any ungulates are sighted in that area, the State will commence aerial shooting and will shoot any ungulates sighted in that area. The State may combine aerial sighting and shooting activities. The State and Plaintiffs, by mutual agreement, may modify the time frame for the aerial sightings or aerial shooting or both without amending this stipulation.

This stipulation was apparently entered into and approved without any input from Intervenors.

Now come Sportsmen of Hawaii, Inc., one of the intervenors in the original proceeding, and move on May 12, 1999, to "rescind temporarily" the order of January 27, 1987, and to order the State Attorney General to "cease and desist from entering into agreements with the Sierra Club representatives without consultation with the Defendants–Intervenors."

The interests of hunters were considered sufficiently important in the 1970s to give them standing to intervene. However, preservation of the Palila had priority over shooting sheep. *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), teaches us that Congress intended by the Endangered Species Act of 1973 to

halt and reverse the trend toward species extinction—whatever the cost.

The present motion is stated to be brought pursuant to Fed.R.Civ.P. 60(b)(5) "in that it is no longer equitable that the prior judgment have prospective application" and that expert scientific evidence concerning the Palila "clearly justify relief" from that judgment.

The Sportsmen seek a halt to the eradication of sheep coupled with a period of monitoring the current effect of the sheep on the Palila's habitat as to fire hazard diminishment and the growth of the mamane/naio forest.

Intervenors allege sufficient change of circumstances to adjust the original decree in order to allow Palila and sheep to coexist in the Palila's critical habitat. They point to the Palila Restoration Project Final Report as failing to cite any instance in which the current number of sheep have any deleterious effect on either the Palila or its habitat.

The Sportsmen are to be commended for their concern over the Palila's survival. However, they do not represent the Palila, and their basis for intervention in the first place was to protect the interests of hunters who shot sheep on Mauna Kea for sport and food.

They now take up Representative Mink's themes, which probably came from them in the first place. They argue that "at current levels" sheep are not harming the Palila or its habitat. To the contrary, they argue that the growth of alien grasses in many areas of the habitat have created a dangerous fire fuels level and fire hazard which are best suppressed by an increase in resident ungulates to reduce the grasses by eating them and trampling them. They point to other predators that are harming the Palila, such as feral cats, mice and rats, and mongooses. They note also other threats to Palila food resources, such as wasps, yellowjackets, and ants.

*Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), teaches us that Rule 60(b)(5) provides for modification of a court order when it is no longer "equitable" that the judgment should have prospective application, not when it is no longer convenient to live with the terms of the decree, and that a party seeking modification may meet its initial burden by showing a significant change either in factual conditions or in law.[2]

■ Intervenors argue that the law has changed since the entry of the January 27, 1987, order. They cite Justice O'Connor's concurring opinion in *Babbitt v. Sweet Home Chapter, et al.,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), in which she calls into question the decision in *Palila II,* 852 F.2d 1106 (9th Cir.1988), and some of its applications. The statement is dictum by a single justice who is in the minority on this issue.[3] This hardly qualifies as a change in the law.

Plaintiffs point out that this issue was dealt with in *Marbled Murrelet v. Babbitt,* 83 F.3d 1060 (9th Cir.1996), and *Loggerhead Turtle v. County Council of Volusia County,* 148 F.3d 1231 (11th Cir.1998), and decided against Intervenors' contention in both cases. There has, as yet, been no change in the applicable law.

Neither has there been a significant change in factual conditions. The Palila Restoration Project Final Report relied on by Intervenors recommends at page 109 that:

> Feral sheep and mouflon should be excluded from palila habitat so that mamane tree size and density increase as rapidly as possible.

The arguments that the presence of sheep on Mauna Kea had nothing to do with the decline of the Palila population, and that a remnant sheep population will

---

**2.** *Rufo* relates to a consent decree relating to the conditions of housing of inmates at the Suffolk County Jail. The general principles enunciated, however, are applicable here.

**3.** The dissenting justices also criticize *Palila II.* By definition, a dissent does not establish the law.

not harm the Palila or its habitat are disingenuous. This only reargues the original actions. Ungulates were ordered removed because they interfere with mamane growth by eating or trampling mamane seedlings. Certainly as more and more ungulates are removed from the area their "devastating effect on the mamane forest" becomes less and less. This may provide an amusing mathematical exercise but it is not a feature of the Endangered Species Act.

■ Further, the fact that other predators may be more harmful to the Palila or that fire on Mauna Kea may be a serious danger are irrelevant to the issue of whether sheep should continue to be removed. The proposition that ungulates are the best defense against fire suggests that in order to save the Palila from extinction by fire we should increase the number of sheep so they can share in the destruction of the Palila.

Of course, a "remnant population" of sheep will not have any adverse impact on the survival of the Palila. Exh. D to Intervenors' Motion. While Jon Giffin does not quantify "remnant population," logically a small enough number of sheep will have an unmeasurable effect on mamane regeneration. This assumes cooperation from the sheep to limit themselves to a "remnant population" that does not nibble too many mamane seedlings. On the other hand, mouflon sheep can always be reintroduced on Mauna Kea. Palila once extinct are gone forever. In the weighing of the relative merits of the situation, there has not been a shifting of the original equities.

For the foregoing reasons, Intervenors' Motion pursuant to Fed.R.Civ.P. 60(b)(5) or (6) is DENIED.

On July 23, 1999, the Hawaii Department of Land & Natural Resources and Timothy E. Johns in his capacity as Chairperson of the Hawaii Board of Land & Natural Resources (hereinafter referred to as the State) filed a related motion pursuant to the same provisions of the Federal Rules of Civil Procedure.

The State supports the Intervenors' motion, which the State describes as being "based upon the threat of fire to the habitat of the palila." As pointed out above, increasing the danger to the Palila's critical habitat from browsing sheep in order to decrease the danger to the same habitat from fire is not a solution that is recommended by any knowledgeable expert.

However, the State has its own reasons for relying on Fed.R.Civ.P. 60(6)(5) and (6).

The State asks that the eradication order of January 27, 1987, be amended because since the eradication order was filed, the facts have shown that:

(1) it is extremely difficult, if not impossible, to completely eliminate all the sheep from the Palila's critical habitat; and

(2) the numbers of sheep in the recent past, as well as the present time, have not significantly modified or degraded the mamane forest to the extent that the Palila is injured; and

(3) less sheep do not necessarily amount to more Palila.

Accordingly, the State moves that the eradication order be amended to provide that:

(1) The State be enjoined from attempting to maintain a sheep population for a sport hunting program and shall continue to use reasonable efforts to remove the sheep from the Palila's critical habitat. At a minimum, the State shall:

a. maintain the current year round eradication program using the public to remove the sheep; said program shall have no restrictions on bag limits or the sex or age of the sheep that may be taken;

b. continue to maintain the existing 53 miles of fence around Mauna Kea to exclude sheep from entering from the adjoining private lands;

c. conduct at least one aerial patrol each year to count the number of

sheep in the palila's critical habitat area; if the aerial count of the number of sheep in the area exceed [sic] 200 animals, the State shall make additional reasonable efforts to reduce the amount of sheep to 200 animals, as determined by an aerial count.

d. continue to file semi-annual reports with the court indicating what actions have been taken to implement the mandate of the court, and what the aerial count of sheep was within the palila's critical habitat for at least one of the six-month periods within each year.

This motion by the State comes eight and a half months after the State and the Plaintiffs entered into the stipulation of November 10, 1998, mentioned above. No reason is given as to why the State is changing its earlier agreed position.

The November stipulation provides for semi-annual aerial sightings beginning November 18, 1998. The requested change is to annual aerial sightings.

The November stipulation provides for the State to commence aerial shooting if any ungulates are sighted. The requested change is only to make "reasonable efforts" to reduce the number of observed sheep to 200 animals.

The State states that it is "no longer pursuing the objective of maintaining sheep in sufficient numbers for sport-hunting purposes." This seems to be an admission that the State has up to now been pursuing that objective in disregard of the court's eradication order. The practical effect of the State's suggested change is to maintain a population of at least 200 visible animals plus the animals that are hidden from view within the mamane forest. Thus the State's disclaimer is at best disingenuous.

The sheep number of 200 was arrived at because in the past five years the maximum number of sheep counted at any one time was 319 (on May 19, 1997). The State argues that in spite of that many sheep, the number of sheep within the past

few years has not significantly affected the mamane. Therefore, the State is using the number 200 "to stay on the conservative side." This number is one-third higher than Representative Mink's understanding that there was a non-threatening remnant sheep population of "150 + ."

The State states also that it "still intends to maintain the current year-round eradication program using the public to remove the sheep." However, the reason that the State engaged in staff hunting and aerial shooting in the first place has been that depending upon public hunting did not produce sufficient results.

The case for accommodating the conflicting requirements of the Endangered Species Act and of hunters would be much stronger if the question were to be put squarely to the experts within the State DLNR and the U.S. Fish and Wildlife Service. None of them has recommended abandoning removal of all sheep from the Palila's critical habitat.

The State is on firmer ground when it argues that "it is practically impossible to eliminate all the sheep within the palila's critical habitat."

The State notes that Mauna Kea is a vast area, parts of which are difficult to access, and with areas that contain dense vegetation. This increases the difficulty of locating all the sheep that may be on the mountain.

The State notes also that sheep inhabit adjoining private lands and from these private lands encroach onto the Palila's critical habitat in spite of the 53 miles of fencing surrounding Mauna Kea. The fencing suffers damage from vandalism, washouts in gullies, falling trees, and domestic cattle, allowing openings for these neighboring sheep to enter the supposedly restricted area.

The State further notes that the reduction of the number of sheep has allowed the mamane to increase in number, size,

and density thus providing shelter for the sheep from hunters and aerial shooting.[4]

Neither the order of January 27, 1987, nor the court-approved stipulation of November 10, 1998, require the State to achieve total success within any fixed time frame. The court is aware that State officials face not only competing political pressures but also serious budgeting problems. However, they do not contend that they cannot continue their eradication efforts pursuant to the existing orders.

For the foregoing reasons, the State's Motion pursuant to Fed.R.Civ.P. 60(b)(5) & (6) is DENIED.

IT IS SO ORDERED.

---

4. "The best laid schemes o' mice an' men gang aft a-gley." Robert Burns 1759–1796.