**GREENPEACE FOUNDATION, Center for Biological Diversity; and Turtle Island Restoration Network, Plaintiffs,**

v.

**Norman MINETA,[1] Secretary, United States Department of Commerce; and Penelope D. Dalton, Assistant Administrator of the National Marine Fisheries Service, Defendants,**

**and**

**Association of NWHI Lobster Permit Holders, Defendant–Intervenor.**

**No. Civ. 00–00068SPKFIY.**

United States District Court, D. Hawaii.

Nov. 15, 2000.

---

1. Norman Mineta, successor to William M. Daley as Secretary of Commerce, is substitut-

ed as a co-Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

1124

Paul Achitoff, David L. Henkin, D. Kapuaala Sproat, Earthjustice Legal Defense Fund, Honolulu, HI, for plaintiffs Greenpeace Foundation, Center for Biological Diversity, and Turtle Island Restoration Network.

Steven S. Alm, R. Michael Burke, Office of the United States Attorney, Honolulu, HI, Anthony P. Hoang, Mark A. Brown, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for defendants Norman Mineta and Penelope Dalton.

Bryan Y.Y. Ho, Donald E. Fisher, Honolulu, HI, for defendant-intervenor Association of NWHI Lobster Permit Holders.

*ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION*

SAMUEL P. KING, District Judge.

## OVERVIEW

This is the second round of litigation concerning the fate of the Hawaiian monk seal. Our first exposure to the plight of the monk seal was in the context of Plaintiffs' motion for a preliminary injunction against Defendants' operation of the lobster fishery in the Northwestern Hawaiian Islands. There, this Court determined that Plaintiffs enjoyed a reasonable likelihood of success on their claim that the continued operation of the lobster fishery threatens the survival of the monk seal. However, the Court denied preliminary injunctive relief because Defendants voluntarily closed the fishery for the 2000 fishing season. Plaintiffs now return to secure summary judgment that the operation of the lobster fishery—as well as the operation of the bottomfish fishery in the Northwestern Hawaiian Islands[2]—violates the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* Plaintiffs also seek permanent enjoinment of the operation of both fisheries until Defendants have complied with their statutory and regulatory obligations. Defendants seek summary judgment on all claims by cross-motion. Defendant–Intervenor Association of NWHI Lobster Permit Holders opposes Plaintiffs' motion. Having reviewed the motions, pleadings, supporting and oppos-

---

**2.** Plaintiffs' claims concerning the bottomfish fishery were not before the Court in the pre- liminary injunction proceedings.

ing memoranda, and the administrative record, the Court grants partial summary judgment to Plaintiffs, grants partial summary judgment to Defendants on mootness grounds, and enjoins further operation of the lobster fishery.

## FACTUAL BACKGROUND

The intricate factual background of this case is described in some detail in this Court's last Order. *See* Order Denying Plaintiffs' Motion to Strike, Granting Association of NWHI Lobster Permit Holders' Motion for Leave to Intervene, and Denying Plaintiffs' Motion for Preliminary Injunction ("P.I.Order"), *Greenpeace Found. v. Daley,* Civ. No. 00–00068SPKFIY (D.Haw. June 5, 2000). Therefore, a summary of the facts most salient to the instant motions will suffice.

The Hawaiian monk seal (*Monachus schauinslandi* ) ("monk seal") is an endangered species. *See* 50 C.F.R. § 17.11. Statistics on the status of the monk seal paint a grim picture. Recent population estimates indicate that the current monk seal population numbers at approximately 1,300 to 1,400. *See* A.R. Vol. XXXIII, No. 1590, at 61.[3] A 1997 National Marine Fisheries Service ("NMFS") report noted that the seal population at French Frigate Shoals ("FFS") atoll, which is home to one of the largest monk seal colonies, has declined nearly 55% since 1989. *See* A.R. Vol. XXII, No. 1302, at 1. The survival rate of monk seal pups is another portent of the bleak outlook for the monk seal. In the mid–1980's, approximately 90% of seal pups at FFS survived to age two. The survival rate declined to about 10% in the mid–1990's. *See* A.R. Vol. XXXIII, No. 1590, at 61, Fig. 2(a). Indeed, NMFS scientists agree that "[t]he overall status of

the Hawaiian monk seal is extremely grave." A.R. Vol. XXVI, No. 1403, at 238.

The monk seal is endemic to Hawaii. It inhabits eight areas in the Northwestern Hawaiian Islands ("NWHI"): FFS, Laysan Island, Lisianski Island, Pearl and Hermes Reef, Midway Atoll, Kure Atoll, Necker Island, and Nihoa Island. Defendant NMFS has designated the NWHI as the monk seal's "critical habitat."

An active lobster fishery and bottomfish fishery operate in the NWHI. NMFS and the Western Pacific Regional Fishery Management Council ("Council") manage each fishery via separate Fishery Management Plans ("FMP") prepared pursuant to the Magnuson–Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq. See* A.R. Vol. XV, No. 831, at 3. NMFS adopted the FMP for the Crustacean Fisheries of the Western Pacific Region ("Crustacean FMP") in 1983, and the FMP for the Bottomfish and Seamount Groundfish Fisheries of the Western Pacific Region ("Bottomfish FMP") in 1986. *See* A.R. Vol. XVII, No. 1050; A.R. Vol. XXII, No. 1294. The lobster fishery harvests spiny lobster (*Panulirus marginatus* ) and slipper lobster (*Scyllarides squammosus* ). The bottomfish fishery targets snappers, groupers, and jacks. Monk seals are known to prey on the species harvested by the fisheries. *See* A.R. Vol. XIII, No. 664, at 17; A.R. Vol. XVIII, No. 1590, at 64.

Plaintiffs Greenpeace Foundation, Center for Biological Diversity, and Turtle Island Restoration Network ("Plaintiffs") brought this suit against Defendants Norman Mineta, Secretary of Commerce; and Penelope D. Dalton, Assistant Administrator of the NMFS (collectively, "Defendants"). The target of the suit is the embattled NMFS,[4] whom Plaintiffs allege

---

**3.** "A.R." denotes citation to the Administrative Record.

**4.** NMFS is entangled in another citizen suit in this Court similar to this one. *See Leatherback Sea Turtle v. National Marine Fisheries Serv.,* Civ. No. 99–00152DAE (D.Haw.1999).

That suit, also litigated by counsel for the plaintiffs here, asserts·that NMFS's management of the longline fishery in Hawaii poses harm to various species of threatened or endangered sea turtles. Judge David A. Ezra partially enjoined the operation of the long-

is violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, by managing the fisheries in a manner that does not comply with Sections 7 and 9 of the Endangered Species Act ("ESA"), and the National Environmental Policy Act ("NEPA").

The crux of the ESA claims is that the fisheries are depleting the monk seal's food supply and interacting with monk seals in an injurious manner. Cast in the language of the ESA, the claims allege that (1) NMFS has been remiss in performing its Section 7 duty to consult with the Secretary of Commerce regarding the impact of the FMPs on protected species,[5] and (2) the operation of the fisheries has resulted in "takes" of monk seals in violation of Section 9.

With regard to the NEPA claims, Plaintiffs contend that NMFS has not adequately assessed the environmental impact of the fisheries on the monk seal. NEPA requires federal agencies to (1) prepare an Environmental Impact Statement ("EIS") when engaging in "major federal actions significantly affecting the quality of the human environment," and (2) supplement an existing EIS when there are "significant new circumstances or information relevant to environmental concerns" posed by the agency action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.9(c)(1)(ii). NMFS prepared an EIS in connection with the Crustacean FMP, but not for the Bottomfish FMP. Plaintiffs argue that new data concerning the role of lobster in the monk seal's diet require the preparation of a new EIS for the Crustacean FMP. NMFS has agreed to supplement the existing EIS, but Plaintiffs insist on enjoinment of the lobster fishery until the new EIS is complete. As for the Bottomfish FMP, NMFS sagely has begun preparing an EIS, but as with the lobster fishery, it faces Plaintiffs' demand for an injunction pending completion of the EIS. Defendant–Intervenor Association of NWHI Lobster Permit Holders ("Intervenor") opposes any injunction against the operation of the lobster fishery.

NMFS has already survived a motion for a preliminary injunction against the lobster fishery. This Court denied injunctive relief because NMFS's voluntary closure of the lobster fishery for the 2000 fishing season sharply diminished the possibility of harm to the monk seal in the immediate future. However, this Court also determined that there was a reasonable likelihood that Plaintiffs would prevail on their claims. The Court now addresses whether Plaintiffs enjoy actual success on their claims.

## DISCUSSION

### I. MOOTNESS

NMFS asserts that every claim in this case is moot except the ESA claims pertaining to the bottomfish fishery. This Court addressed and rejected NMFS's mootness arguments in deciding the preliminary injunction motion. Many of the same arguments reappear here, and they do not fare much better this time.

■ NMFS can claim partial success on one mootness argument based on its decision to reinitiate formal consultation on the Crustacean FMP. *See* Lent Decl. of Sept. 29, 2000, Exh. "1" to Defs.' Mot.Summ.J. ¶ 15.[6] In light of this decision, the Section

---

line fishery until NMFS complied with the ESA and NEPA.

5. The Secretary has designated NMFS to act on his behalf with regard to the fisheries. Hence, NMFS is both the acting and the consulting agency. In this arrangement, NMFS consults with itself.

6. According to Dr. Rebecca Lent, Regional Administrator of NMFS, formal consultation will be completed before any lobsters are removed other than for tagging/sampling and replacement. *See* Lent Decl. of Sept. 29, 2000 ¶ 15. The Court takes Dr. Lent at her word. As far as the Court is aware, however, NMFS has not made any official pronouncement that it will reinitiate formal consultation, such as by publication in the *Federal Register*. If it becomes apparent that NMFS will not reinitiate formal consultation, then

7 claim corresponding to the lobster fishery is moot to the extent it seeks reinitiation of formal consultation. The claim is not moot, however, to the extent it seeks summary adjudication that past consultation efforts fell short of Section 7 requirements. An agency's decision to reinitiate consultation does not result in the withdrawal of a previously completed and issued biological opinion. *See Greenpeace v. National Marine Fisheries Serv.*, 80 F.Supp.2d 1137, 1151 (W.D.Wash.2000). *Greenpeace*, a case similar to this one, involved litigation to protect the endangered Stellar sea lion from harm caused by the management of a groundfish fishery. The plaintiffs there asserted, *inter alia*, a Section 7 claim for reinitiation of consultation on the FMP governing the fishery. Before the Court had occasion to decide a motion for summary judgment on the claim, NMFS voluntarily reinitiated consultation and argued that the Section 7 claim was moot. The court rejected the suggestion of mootness, noting that the existence of the old—and allegedly inadequate—biological opinions preserved the justiciability of the claim. The Court finds the reasoning in *Greenpeace* persuasive.

NMFS argues that *Greenpeace* is distinguishable because the groundfish fishery remained active during consultation in that case, whereas here NMFS has closed the lobster fishery pending the completion of consultation. Whether fishing activity is ongoing during consultation is relevant to the potential of direct harm to listed species, a concern Section 9 of the ESA addresses. Plaintiffs' Section 7 claim does not voice the same concern per se. Rather, the claim alleges that NMFS failed to consult using "the best scientific and commercial data available"—a procedural violation. 16 U.S.C. § 1536(a)(2). Accordingly, so long as the current biological opinions governing the Crustacean FMP stand in place, a challenge to the adequacy of those opinions is justiciable.

the Section 7 claim in question becomes justiciable once again.

■ The same result does not attend to the Section 7 claim concerning the Bottomfish FMP, however. Although NMFS does not argue that this claim is moot, the Court is obliged to consider mootness *sua sponte*. *See Riverhead Sav. Bank v. National Mortgage Equity Corp.*, 893 F.2d 1109, 1112 (9th Cir.1990). The object of this Section 7 claim, unlike its counterpart pertaining to the Crustacean FMP, is to compel NMFS to reinitiate formal consultation on the Bottomfish FMP in light of new information about the impact of bottomfishing on the monk seal; Plaintiffs do not seek a judicial determination that past consultation on the FMP was inadequate. *Compare* Compl. ¶¶ 73–75 (lobster fishery Section 7 claim) *with id.* ¶¶ 76–77 (bottomfish fishery Section 7 claim). NMFS has already acquiesced: It requested reinitiation of formal Section 7 consultation on the Bottomfish FMP on October 16, 2000. *See* Lent Decl. of Oct. 19, 2000, Exh. "1." It would serve no purpose to order NMFS to do what it has already done.[7] The claim is moot.

■ NMFS's remaining mootness arguments lack merit. NMFS argues that the Section 9 claim pertaining to the lobster fishery is moot because NMFS has closed the fishery for the 2000 season, and intends to keep it closed through December 31, 2001 in Areas 1, 2, and 3 (Necker Island, Maro Reef, and Gardner Pinnacles), and through December 31, 2002 in Area 4 (all other areas). *See* Lent Decl. of Sept. 29, 2000, ¶ 15. With respect to the NEPA claims, NMFS claims they are moot because NMFS has begun preparing an EIS for both fisheries. *See id.* ¶¶ 4–7.

NMFS bears the heavy burden of demonstrating mootness. *See Headwaters, Inc. v. Bureau of Land Management, Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir.1989) (citing *Los Angeles County v. Davis*, 440 U.S. 625, 99 S.Ct. 1379, 59

7. Of course, the Court may order NMFS to do what it only *intends* to do. *See infra* at 11–12.

L.Ed.2d 642 (1979)). NMFS's plans to close the lobster fishery and to comply with NEPA invite scrutiny, for "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *United States v. Concentrated Phosphate Export Ass'n, Inc.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). Where the defendant has voluntarily ceased to engage in unlawful conduct, the inquiry is "whether the defendant is free to return to its illegal action at any time." *Public Utils. Comm'n v. Federal Energy Regulatory Comm'n,* 100 F.3d 1451, 1460 (9th Cir.1996). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Concentrated Phosphate,* 393 U.S. at 202, 89 S.Ct. 361.

NMFS has not shown that the harm underlying Plaintiff's Section 9 and NEPA claims has been eradicated, never to return. The only certainty at present is that lobster fishing has been suspended for the 2000 lobster fishing season. NMFS is to be commended for its intention to close the lobster fishery for an extended period of time. However, it has not taken official action to effectuate its intent, such as by publication in the *Federal Register* of a proposed or final rule implementing the closure. NMFS is thus free to reopen the lobster fishery at will and breathe new life into the Section 9 claim. As this Court noted in the P.I. Order, the agency action for which Plaintiffs seek judicial review is the implementation of the FMPs, not actual fishing activity. *See* P.I.Order at 12. The lobster fishery continues to be managed pursuant to the allegedly flawed Crustacean FMP, under which lobster

fishing will proceed beginning July of every year absent the promulgation of a rule closing the fishery. *See* 50 C.F.R. § 660.45.

The NEPA claim is justiciable for an additional reason. NMFS has not yet fully complied with NEPA, a fact made apparent by NMFS's voluntary preparation of a new EIS for the Crustacean FMP and an initial EIS for the Bottomfish FMP. Consequently, Plaintiffs have a justiciable claim for injunctive relief pending completion of the new EISs. *See Leatherback Sea Turtle,* Civ. No. 99–00152DAE, at 32–33.

## II. ENDANGERED SPECIES ACT

### A. *Section 7*

Section 7 of the ESA requires every federal agency to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence" or "result in the destruction or adverse modification of habitat" of listed species. 16 U.S.C. § 1536(a)(2). To fulfill its obligation under Section 7, an agency must consult with the Secretary of Commerce. *See id.* An agency must use "the best scientific and commercial data available" in conducting the consultation. *Id.*

Consultation can be informal or formal. Informal consultation is an optional process designed to assist an agency in determining whether formal consultation is required. *See* 50 C.F.R. § 402.14(a). If an agency determines during informal consultation that the proposed action is not likely to adversely affect listed species or critical habitat, and the Director concurs,[8] the consultation process is terminated, and no further action is required. *See id.* If, however, the agency determines that the proposed action may affect listed species or critical habitat, formal consultation is required. *See id.* § 402.14(a).

**8.** The Director in this case refers to the Assistant Administrator for Fisheries of the National Oceanic and Atmospheric Administration or his authorized representative; the Director can also be the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out. *See* 50 C.F.R. § 402.02.

After consultation is complete, the Secretary must prepare a biological opinion. *See* 16 U.S.C. § 1536(b)(3)(A). The biological opinion must include a "detailed discussion of the effects of the action on listed species or critical habitat" and the Secretary's "opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," (a "jeopardy opinion"), or whether the proposed action poses no threat of jeopardy or adverse modification (a "no jeopardy opinion"). 50 C.F.R. § 402.14(h)(2), (3). If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, the agency must reinitiate consultation. *See id.* § 402.16(b). Consultation must also be reinitiated if the action is modified in a manner that causes an effect to a listed species or its habitat that was not previously considered. *See id.* § 402.16(c).

Plaintiffs contend that NMFS ignored the best scientific and commercial data available in preparing the biological opinions on the Crustacean FMP.[9] In reviewing whether NMFS's past consultation efforts satisfied Section 7 requirements, the Court applies the standard set forth in the APA, which requires that an agency action be set aside if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

NMFS issued the first biological opinion on the Crustacean FMP in 1981.[10] The theme pervading the opinion is that insufficient information prevented detailed assessment of the impact of the FMP on the monk seal. The opinion identified spiny lobster as a prey species for monk seals, but it could not ascertain its relationship to the monk seal diet. *See* A.R. Vol. XIII, No. 664, at 17. The opinion stated that monk seals are "opportunistic feeders supported by a diverse prey base." *Id.* NMFS believed that monk seals could adapt to other prey species if lobster were to become unavailable. *See id.* However, the available information did not permit NMFS to assess the amount of shift in the monk seal's diet from lobster to other prey caused by lobster fishing or the impact of that stress. *See id.* NMFS opined that the lobster fishery did have the "potential of reducing the lobster populations to levels at which lobsters are no longer available to monk seals." *Id.* NMFS further admitted that the maximum sustainable yield ("MSY") and optimum yield ("OY") estimates of the lobster population calculated by the Council were too high and rested on the erroneous assumption that the lobster stocks in the NWHI were unexploited. *See id.* at 18. The opinion warned: "[I]f OY is overestimated the fishery could result in depletion of the lobster resources. Therefore the FMP does not insure the availability of lobster to monk seals." *Id.* The opinion concluded that "[t]here is insufficient information available for the Council to be able to insure that the proposed activity will not jeopardize the continued existence of the monk seal...." *Id.* NMFS stressed that the opinion was not to be construed as a "no jeopardy opinion" and that it "in no way alleviate[d] the Council of its obligation under Section 7(a)(2) of the ESA to insure that the activities conducted under

9. Plaintiffs also argue that NMFS violated Section 7 in failing to reinitiate formal consultation despite the availability of new data about the monk seal's diet and foraging behavior. As discussed, this argument is moot because NMFS has agreed to reinitiate formal consultation. Thus, the inquiry is focused on whether past consultation efforts on the Crustacean FMP comported with the requirements of Section 7.

10. Plaintiffs do not challenge the 1981 biological opinion as violative of Section 7(a)(2). *See* Compl. ¶¶ 73–75. However, a review of the 1981 biological opinion is necessary because, as explained below, it is relied upon by the 1996 biological opinion, which Plaintiffs do challenge. *See infra* 18–22.

the spiny lobster FMP are not likely to jeopardize the continued existence of the threatened and endangered species which occur in the NWHI...." *Id.* at 20. Despite this conclusion, the opinion paradoxically recommended implementation of the FMP.[11] *See id.*

The conclusions of the 1981 biological opinion are difficult to reconcile with the recommendation of NMFS that the FMP be implemented. NMFS has an affirmative obligation under Section 7(a)(2) to insure that agency action will not jeopardize the continued existence of listed species or adversely modify their habitat. 16 U.S.C. § 1536(a)(2). Certainly, an agency's assessment of proposed action is limited by the best scientific and commercial information available. Data on the role of lobster in the monk seal's diet was admittedly sparse at the time the 1981 biological opinion was prepared. Nonetheless, when an agency concludes after consultation that it cannot insure that the proposed action will not result in jeopardy, and yet proceeds to implement such action, the agency has flouted the plain requirements of Section 7.

The next biological opinion prepared in connection with the lobster fishery, issued in 1996, assessed the impact of Amendment 9 to the Crustacean FMP.[12] Amendment 9 established a new harvest guideline system that allowed fishermen to retain berried and undersized lobsters in a catch. The rationale was that the retention limits then in effect resulted in waste from mortality of lobsters that are captured and released without contributing to the protection of the reproductive potential of lobster stocks. *See* A.R. Vol. XV, No. 863, at 3. The new proposed harvest management program was based on the existing model for calculating the exploitable lobster population. *See id.* The models indicated that stocks of spiny lobster would remain healthy over the long term. *See id.* at 4. At the same time, the opinion noted a "continuing decline in pup production, and total seal counts over the past six years, [which] is cause for significant concern." *Id.* at 6. NMFS attributed the decline to several factors, one of which was the reduction of the availability of prey such as lobster due to lobster fishing. The availability of lobster had been particularly low at FFS for a number of years. *See id.* at 9. NMFS maintained, as it did before and does today, that "monk seals appear to be very opportunistic and catholic feeders." *Id.* However, NMFS still had not elucidated the importance of lobsters to the monk seal's diet. *See id.* Regarding the effect of Amendment 9 on the monk seal, the opinion stated: "[G]iven the relatively healthy status of the stocks of lobsters and the small contribution of French Frigate Shoals to the fishery, it is expected that catch competition with monk seals at French Frigate Shoals would not likely occur." *Id.* at 12. The opinion concluded that the annual harvest guidelines formulated under the proposed harvest rate strategy would protect the reproductive capacity and existing stock of lobster in the NWHI. *See id.* at 12.

The 1996 opinion in many ways perpetuated the errors of the 1981 opinion. As a memorandum from one NMFS scientist to another regarding the 1996 opinion reveals, NMFS takes the position in the opinion that its knowledge of monk seal behavior had not advanced much in the past fifteen years. *See* A.R. Vol. XIV, No. 823. And so management of the lobster

---

11. The biological opinion reasoned that implementing the Crustacean FMP was preferable to taking no action because the FMP would regulate the fishing industry, whereas the fishery would operate and expand without restriction in the absence of an FMP. *See* A.R. Vol. XIII, No. 664, at 19. NMFS constructs a false dichotomy. If conservation of the monk seal is a high priority objective for NMFS, an unconsidered alternative would have been to regulate lobster fishing by banning it until more information regarding the impacts of lobster fishing on listed species was available.

12. NMFS also conducted informal consultation on the FMP in 1991. *See* A.R. Vol. XV, No. 863, at 2.

fishery remained relatively unchanged. The harvest management system under Amendment 9 was predicated on the existing model of calculating the exploitable population of lobster, with the addition of a guideline permitting retention of berried and undersized lobsters. NMFS ignored the flaws of that model, as evidenced by its observation in the 1996 opinion that the status of the lobster stocks was relatively healthy. *See* A.R. Vol. XV, No. 863, at 12. In fact, the lobster stocks showed signs of stress. From 1983 to 1991, the catch per unit effort ("CPUE") declined from 2.71 to 0.56 legal spiny and slipper lobsters per trap haul. *See* A.R. Vol. XVI, No. 983, at 5. NMFS closed the lobster fishery in 1991 and 1993. It reopened the fishery briefly in 1994, but aborted the season shortly after it began when it realized that its harvest quota was too high. In the year before the 1996 biological opinion issued, the CPUE was an anemic 0.60. *See id.* Such data should have alerted NMFS that the existing model of calculating the exploitable lobster population was in need of revision. NMFS ignored the data.

Moreover, the 1996 opinion overemphasized the importance of the status of the lobster stocks at FFS. A 1992 NMFS report on the status of the monk seal found that monk seals at FFS may depend on the availability of food at Gardner Pinnacles and Necker Island, where most of the lobster harvest has occurred for many years. *See* A.R. Vol. XXXII, No. 1564, at 25. The 1996 opinion did not examine the availability of lobster in those areas of the NWHI.

A review of the 1996 opinion convinces the Court that NMFS did not adequately discharge its duties under Section 7(a)(2). If, in the 1981 opinion NMFS was uncertain of the impact of the FMP because it knew too little about the monk seal diet, by 1996 it was emboldened by its ignorance to draw definitive conclusions about the impact. NMFS reiterated in the 1996 opinion that the available information still had not clarified the importance of lobster in the monk seal diet; yet, in a departure from its conclusion in 1981, NMFS this time concluded that no jeopardy to the monk seal would result. NMFS arrived at this conclusion despite the fact that the fishery operated up to the 10- and 20-fathom isobath areas of Maro Reef, FFS, and Necker Island—all within the critical habitat of the monk seal, which by then had been designated. *See* A.R. Vol. XIV, No. 823, at 2. The explanation for the reversal in judgment is that the 1996 opinion focused on Amendment 9 alone. But ESA regulations require NMFS to consider "the effects of [agency action] as a whole." 50 C.F.R. § 402.14(c). While Amendment 9 might be an innocuous measure as far as monk seal survival is concerned, it is appended to an FMP that NMFS could not insure would be consistent with the continued existence of the monk seal. In making a "no jeopardy" determination in the 1996 opinion, NMFS essentially affirmed that the existing model of calculating lobster stocks was workable. The available data indicated it was not. By neglecting such data, and by failing to evaluate the Crustacean FMP's impact on prey availability for the monk seal in all areas of the NWHI (not just FFS), NMFS was arbitrary and capricious in reaching the conclusions contained in the 1996 biological opinion.

Little needs to be said about the latest consultation effort completed—an informal consultation conducted in 1999—except that it reiterates the conclusions of the previous two biological opinions. NMFS concluded after the 1999 consultation that the proposed 1999 harvest guideline was not likely to adversely affect monk seals—this, despite comments from its scientists that there was insufficient scientific information to support the conclusion.[13] *See*

---

13. The validity of this conclusion is also placed into doubt by NMFS's agreement to initiate formal consultation on the Crustacean

FMP. ESA regulations do not require an agency to undergo formal consultation if the agency determines during informal consulta-

A.R. Vol. XVI, No. 938. There is no indication that NMFS has departed from its current model of determining the exploitable lobster population. The conclusion of "not likely to adversely affect" does not square with NMFS's admission that the existing model grows increasingly uncertain. *See* Notice of Closure of the Year 2000 Fishery, 65 Fed.Reg. 39,314, 39,315 (2000); *see also* A.R. Vol. XVI, No. 931, at 2 (describing the generally poor quality of data used to assess bank-specific estimates of exploitable lobster populations for 1998, from which harvest guidelines are derived).

NMFS has failed to fulfill its "rigorous" affirmative duty under Section 7 to "insure" that implementation of the Crustacean FMP does not result in jeopardy or adverse modification. *See Sierra Club v. Marsh,* 816 F.2d 1376, 1385 (9th Cir.1987). NMFS cannot speculate that no jeopardy to monk seals or adverse modification of their critical habitat will occur because it lacks enough information regarding the impact of the fishery on seals. *See Bensman v. United States Forest Serv.,* 984 F.Supp. 1242, 1248 (W.D.Mo.1997); *Conservation Law Found. v. Watt,* 560 F.Supp. 561, 572 (D.Mass.1983), *aff'd,* 716 F.2d 946 (1st Cir.1983). Such a conclusion is arbitrary and capricious. Accordingly, the Court GRANTS summary judgment to Plaintiffs and DENIES summary judgment to Defendants on the claim that past consultation on the Crustacean FMP violates Section 7(a)(2) and the APA.

### B. *Section 9*

Section 9(a)(1)(B) of the ESA makes it unlawful for any person to take any endangered species of wildlife within the United States or the territorial seas of the United States. *See* 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any

tion that the proposed action is not likely to adversely affect listed species or critical habi-

such conduct." 16 U.S.C. § 1532(19). The term "harm" includes "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102; *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (upholding ESA regulation that included "significant habitat modification" in the definition of "harm").

### 1. *The Lobster Fishery*

█ Plaintiffs claim that the lobster fishery adversely modifies the habitat of the monk seal by depleting the lobster population in the NWHI. It is undisputed that the fishery removes prey from the critical habitat of the monk seal. The question is whether the removal of prey results in adverse habitat modification. Plaintiffs offer circumstantial evidence that it does. One study revealed that monk seals at FFS dive deeper and travel farther to forage than seals at Pearl and Hermes Reef because there is less food available at FFS. *See* A.R. Vol. XXVI, No. 1422, at 5–6. Another study found that monk seals at FFS consume more cephalopods than seals elsewhere because other prey is less available to them. *See* A.R. Vol. XXIV, No. 1338, at 544. Decreased prey availability has been hypothesized to be a cause of the decline in the reproduction, survival, and condition of surviving immature seals. *See* A.R. Vol. XXXII, No. 1564, at 25. Plaintiffs also rely on studies of the monk seal's diet. One study found that lobster contains amino acids and macrominerals important to bodily functions of the monk seal. *See* A.R. Vol. XXIV, No. 1344, at 141, 146. Fatty acid signature analysis of monk seal blubber suggests that lobster comprises a significant

tat. *See* 50 C.F.R. § 402.14(a).

part of the monk seal's diet. *See* A.R. Vol. XXIV, No. 1356 at 13.

The information in the record is insufficient to establish as a matter of law that lobster is absolutely critical to the diet of the monk seal. Plaintiffs may of course rely on circumstantial evidence to show a causal link between lobster fishing and the monk seal population. Circumstantial evidence was the basis for the findings of adverse habitat modification in *Palila v. Hawaii Department of Land & Natural Resources*, 471 F.Supp. 985 (D.Haw.1979), *aff'd*, 639 F.2d 495 (9th Cir.1981), and *Sierra Club v. Lyng*, 694 F.Supp. 1260 (E.D.Tex.1988), *aff'd in relevant part, Sierra Club v. Yeutter*, 926 F.2d 429 (5th Cir.1991). The difference is that the agency action in those cases destroyed or modified a feature of the species' habitat that was decidedly critical to the continued existence of the species. In *Palila*, this Court found that mamane trees were clearly essential to the endangered Palila's survival. *See Palila*, 471 F.Supp. at 989; *see also Palila v. Hawaii Dep't of Land & Natural Resources*, 73 F.Supp.2d 1181, 1182 (D.Haw.1999). In *Lyng*, the court found that the very shelter upon which the red-cockaded woodpecker depended for survival was threatened by the Forest Service's management of the Texas national forests. *See Lyng*, 694 F.Supp. at 1265.

Here, it is not certain that lobster plays such an essential role in the monk seal diet that a reduction of lobster prey dooms the monk seal to extinction. The studies Plaintiffs rely upon do not prove otherwise. Studies of monk seal foraging behavior may indicate a decrease in prey availability in general, but they do not show that it is a reduction in the availability of *lobster* that causes monk seals to consume other prey. Indeed, one study hypothesized that monk seals were consuming more octopi because fewer teleosts (ray-finned fish) were available. *See* A.R. Vol. XXIV, No. 1338, at 544. Nor do the data based on fatty acid signature analysis prove that the monk seal relies heavily on lobster as part of its diet. Dr. Sara Iverson, the researcher conducting the studies, submits a declaration to the Court in which she states that her findings "cannot be conclusive and should not be used as a basis for decisions concerning possible interactions between fisheries and monk seals." Iverson Decl., Exh. "1" to Defs.' Mot.Summ.J. ¶ 8. Dr. Iverson emphasizes that her research is "preliminary" and that it has not been peer reviewed. *See id.* ¶ 9. She anticipates an additional three years of research before she can make "firm and defensible conclusions" about the importance of various prey in the monk seal diet. *See id.* ¶ 12.[14]

The Court agrees that preliminary findings are not a basis for a conclusive determination that lobster comprises a significant and essential portion of the monk seal diet. On the basis of the currently available scientific information, this Court cannot find as a matter of law that the removal of lobster from the monk seal's critical habitat results in "harm" to the monk seal within the meaning of Section 9. The role of lobster in the monk seal diet is a question of fact that precludes summary judgment on the Section 9 claim.

The ruling does not assure victory for NMFS. NMFS's position is essentially that it is innocent of Section 9 violations because it is not aware of any data that confirms that it is in violation of Section 9; such is a head-in-the-sand attitude we do not condone.[15] It is also a position in

14. Dr. Iverson has presented her preliminary findings to NMFS's Monk Seal Recovery Team, but chiefly for the purpose of demonstrating fatty acid signature analysis as an innovative technique of examining diets in free-ranging animals, and to report on the progress of her research. *See* Iverson Decl. ¶¶ 7–9.

15. With all this talk of seals, fish, and lobsters, we break the monotony by tendering a fact about a terrestrial member of the animal kingdom. The legend that ostriches bury their heads when faced with danger is just that: a legend. The real story is that ostriches lie on the ground with their necks outstretched to avoid detection. *See* Flight-

conflict with the underlying philosophy, of the ESA. But to this problem we assign the requirements of NEPA and Section 7 of the ESA, not section 9.[16]

Because a material question of fact exists, the Court DENIES summary judgment to Plaintiffs and DENIES summary judgment to Defendants on the Section 9 claim with respect to the lobster fishery.

### 2. *The Bottomfish Fishery*

■ Plaintiffs claim that the bottomfish fishery "takes" monk seals within the meaning of Section 9 of the ESA. Harm to the monk seal allegedly occurs in several ways. First, fishermen sometimes respond violently to monk seals that attempt to take fish from their lines. According to NMFS, there have been incidents of fishermen clubbing or shooting monk seals in response to catch theft. *See* A.R. Vol. XVIII, No. 1071, at 9; A.R. Vol. XVIII, No. 1076, at 2. In 1990, an anonymous informant alleged that one monk seal per day was being killed and discarded by fishermen. *See* A.R. Vol. XIX, No. 1129, at 8. NMFS investigated into the allegations and could not confirm any mortality or injury to monk seals as a result of interaction with bottomfish vessels. *See id.* at 9. Second, bottomfishing gear can harm monk seals. There are reports of monk seals being injured by bottomfish hooks in 1982, 1990, 1994, and 1996. *See id.* at 7–8; A.R. Vol. XXI, No. 1289, at 7–1; A.R. Vol. XXI, No. 1291, at 7–1. Third, bottomfish fishermen are known to discard unmarketable fish near monk seals for them to consume in order to distract them away from fishing lines. Such fish often contain ciguatera toxin, which is poisonous

to seals. *See* A.R. Vol. XIV, No. 809, at 14.

NMFS is aware of the potential for harmful interaction between bottomfish fishermen and monk seals. In a 1986 biological opinion on the implementation of the Bottomfish FMP, NMFS acknowledged the possibility that bottomfish fishermen might harm monk seals, but dismissed it as an insignificant concern given the low rate of interaction anticipated and the fact that NMFS planned to conduct an education program for fishermen. *See* A.R. Vol. XVIII, No. 1090, at 5. NMFS issued another biological opinion on the fishery in 1991, this time addressing an amendment to the Bottomfish FMP which would place observers on selected fishing vessels in the NWHI and expand the number of islands and atolls that required a 50 nautical-mile study zone. NMFS adopted the amendment. Enforcement of the observer policy has been lax, however. *See* A.R. Vol. XX, No. 1238. From 1991 to 1993, NMFS placed observers on approximately 12% of bottomfishing trips in the NWHI. *See* A.R. Vol. XXI, No. 1286, at 126; A.R. Vol. XXI, No. 1287, at 109; A.R. Vol. XXI, No. 1288, at 7–1. No observers were placed on any bottomfish vessels in the NWHI in 1996 and 1997. *See* A.R. Vol. XXII, No. 1292, at 7–1. Without the aid of significant observer coverage, accurate measurement of the incidence of harmful interaction is elusive. *See* A.R. Vol. XXII, No. 1296, at 39–40 (comparing a 7% reported interaction rate on trips with no observers aboard to a 60% reported interaction rate on trips with observers present); A.R. Vol. XX, No. 1238, at 9.

---

less Birds, *in Compton's Interactive Encyclopedia* (1996).

**16.** Under NEPA, federal agencies are under a duty "to gather information and do independent research when missing information that is 'important,' 'significant,' or 'essential' to a reasoned choice among alternatives." *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 495 (9th Cir.1987) (citations omitted). Section 7 of the ESA requires agencies

to use the "best scientific and commercial data available" in conducting consultation on agency action. *See* 16 U.S.C. § 1536(a)(2). Moreover, an agency has a correlative duty to conduct independent research and to make projections of impact to protected species based on existing information. *See Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988); *Bensman,* 984 F.Supp. at 1248.

The evidence in the administrative record confirms that monk seals have been killed, hooked, and poisoned in connection with bottomfishing. Such documented interactions are "takes" within the meaning of Section 9 of the ESA. It is immaterial that certain of these incidents might be accidental. NMFS has not authorized any incidental takes of monk seals, nor could it, since the monk seal is designated as a "depleted" species under the Marine Mammal Protection Act of 1972. *See* A.R. Vol. XVIII, No. 1090, at 8. Takes of depleted species are permitted for scientific purposes only. *See* 16 U.S.C. § 1371(a)(3)(B). Any takes of monk seals as a result of bottomfishing are a violation of Section 9.

Accordingly, the Court GRANTS summary judgment to Plaintiffs and DENIES summary judgment to Defendants on the Section 9 claim in connection with the bottomfish fishery.

## III. NEPA

NEPA requires a federal agency to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). It is undisputed that the implementation of the Crustacean and Bottomfish FMPs are major federal actions. NMFS prepared an EIS for the Crustacean FMP in 1981. *See* Vol. A.R. XVII, No. 1050. NMFS is currently preparing a new EIS. No EIS for the Bottomfish FMP exists, but NMFS is currently preparing one. The NEPA claims are thus moot to the extent Plaintiffs seek to compel NMFS to do what it already has begun to do. However, Plaintiff still has a justiciable claim for injunctive relief under NEPA pending the completion of the new EISs. The Court is empowered to grant injunctive relief pursuant to NEPA despite NMFS's voluntary compliance. *See Leatherback Sea Turtle,* Civ. No. 99–00152DAE, at 32–33 (holding that environmental group's claim for injunction against longline fishing pending preparation of an EIS was justiciable even where NMFS announced it would prepare a new EIS). The propriety of injunctive relief is the next area of consideration.

## IV. PERMANENT INJUNCTION

### A. *Standard for Injunctive Relief Under NEPA and the ESA*

■■ The traditional test for a permanent injunction is actual success on the merits, irreparable injury, and inadequacy of legal remedies. *See Walters v. Reno,* 145 F.3d 1032, 1048 (9th Cir.1998). The court must balance any competing claims of injury and the effect that a grant or denial of injunctive relief would have on the parties and the public interest. *See Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988). This is the test for injunctive relief under NEPA. *See Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 551 (9th Cir.1977). The law in the Ninth Circuit used to be that irreparable damage is presumed when an agency is held in violation of NEPA by failing to evaluate thoroughly the environmental impact of a proposed action. *See Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1250 (9th Cir.1984). The Supreme Court has since overruled *Clark,* finding such a presumption of irreparable injury to be contrary to traditional equitable principles. *See Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Courts must therefore search for irreparable harm before awarding a permanent injunction in relief of a NEPA violation.

■ The traditional test for an injunction, however, does not apply in ESA cases. Congress removed the equitable discretion of the courts to balance the parties' competing interests in injunction proceedings under the ESA. *See National Wildlife Fed'n v. Burlington N.R.R.,* 23 F.3d 1508, 1511 (9th Cir.1994). Congress predetermined that the balance of hardships and the public interest tips heavily in favor of protected species. *See Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 174, 98

S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Marsh*, 816 F.2d at 1383. That is not to say that an injunction necessarily issues whenever a violation of the ESA occurs. *See Burlington*, 23 F.3d at 1511. Whether an injunction should issue in the face of an ESA violation depends on whether it is sought under Section 7 or Section 9 of the ESA. The Ninth Circuit has held that where a substantial violation of the ESA's procedural provisions (i.e., Section 7) has occurred in connection with federal agency action, the action must be enjoined pending compliance with the ESA. *See Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). That is because "[i]f a project is allowed to proceed without substantial compliance with [the ESA's] procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result." *Id.* But where the violation is of the substantive provisions of the ESA (i.e., Section 9), a court "must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA." *Burlington*, 23 F.3d at 1511. The plaintiff must show that "a violation of the ESA is at least likely in the future." *Id.* (citing *Amoco*, 480 U.S. at 545, 107 S.Ct. 1396).

**B.** *The Lobster Fishery*

 Because the Plaintiffs are not entitled to summary judgment on their Section 9 claim, the only authority under the ESA supporting enjoinment of the lobster fishery is Section 7. The Court has determined Defendants to be in violation of their Section 7 duty to "insure" that the implementation of the Crustacean FMP does not result in jeopardy or adverse modification. Continued implementation of the FMP thus constitutes an ongoing violation of Section 7. *See Greenpeace v. National Marine Fisheries Serv.*, 106 F.Supp.2d 1066, 1072 (W.D.Wash.2000). The FMP was, and still is, implemented based on the assumption that the biological opinions prepared for the FMP are valid. The opinions are deficient, at least in the method by which they arrive at their con-

clusions. In the absence of consultation on the FMP that comports with Section 7, there is no assurance that ongoing implementation of the FMP will not harm monk seals. *See Thomas*, 753 F.2d at 764. Defendants' violation of Section 7 compels the Court to enjoin operation of the lobster fishery until NMFS completes formal consultation on the Crustacean FMP.

A permanent injunction against the lobster fishery is also appropriate under NEPA. Although this Court had no occasion to determine the necessity of a new EIS for the Crustacean FMP, it now scrutinizes NMFS's past efforts at compliance to determine if there are violations of NEPA supporting a finding of irreparable harm.

NMFS prepared an EIS when the Crustacean FMP was first drafted. *See A.R.* Vol. XVII, No. 1050. The EIS examined, among other things, the lobster fishery's potential of reducing food supplies for monk seals. *See id.* at 208. The EIS determined that the FMP would "protect the reproductive potential of the [lobster] stock in order to achieve long-term productivity in the fishery." *Id.* at 212. It further predicted "a low risk of overfishing, even on a localized basis." *Id.* at 214. NMFS subsequently amended the FMP ten times. NMFS approved Environmental Assessments ("EAs") for some of the amendments, finding "no significant impact" in every instance. None of the EAs assessed the cumulative impact of the FMP and its amendments, focusing instead on the particular amendment prompting the preparation of an EA.

NMFS has failed to conduct a thorough evaluation of the impact of lobster fishing on monk seals pursuant to NEPA. The EIS for the Crustacean FMP is obviously outdated. It contains no analysis, for instance, on the impact of the lobster fishery on the critical habitat of the monk seal, for none had been designated yet at the time. NMFS has never truly departed from its analysis in the original EIS. NMFS did

**1138**

not adequately reevaluate the environmental impact of the fishery even as new scientific information became available, the FMP was amended, and regulatory protection of the monk seal expanded. The subsequent EAs are so limited in scope that they ignore the present impact of the lobster fishery. This is inconsistent with the command of NEPA regulations that an agency consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508–27(b)(7); *see also Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214 (9th Cir.1998) (requiring Forest Service to prepare a single EIS that addressed the cumulative effects of five salvage logging projects proposed for the same watershed). NMFS is obligated under NEPA to take into account new data regarding the health of the lobster stocks, the impact of lobster fishing on the monk seal's diet and survival, and the cumulative impact of operating both lobster and bottomfish fisheries in the NWHI.[17] *See Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1378 (9th Cir.1998) (stating that where several actions have a cumulative environmental effect, NEPA requires such a consequence to be considered in an EIS). This NMFS did not do.

Although a court cannot presume irreparable injury based on such ostensible violations of NEPA, "when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Idaho Sporting Congress Inc. v. Alexander,* 222 F.3d 562, 569 (9th Cir.2000) (quoting *Sierra Club v. United States Forest Serv.,* 843 F.2d 1190, 1195 (9th Cir.1988), in turn quoting *Amoco,* 480 U.S. at 545, 107 S.Ct. 1396). The failure of NMFS to comply with NEPA creates a significant likelihood of harm to monk seals. Without an accurate assessment of the environmental impact of the lobster fishery, there is

no guarantee that continued fishing in the NWHI will not cause injury to monk seals. There is cause enough for concern that fishing might resume before the new EIS is complete. NMFS's assurances that it will close the lobster fishery beyond the 2000 fishing season do not allay the concern, for they lack the force of official policy. They are, rather, intentions fully capable of being unrealized. NMFS may reopen the fishery at will. Indeed, mere inaction by the agency automatically allows lobster fishing to commence come July 2001. Lobster fishing could then proceed as it has in the past, unenlightened by the environmental impact analysis NMFS should have conducted (and might finally be conducting) in the process of preparing a new EIS. Because there is a sufficient likelihood of environmental injury, the balance of harms favors an injunction. *See Amoco,* 480 U.S. at 545, 107 S.Ct. 1396.

Finally, the Court considers the public interest affected by granting injunctive relief under NEPA. A court may refuse to issue an injunction "in the unusual case where enjoining government action allegedly in violation of NEPA might actually jeopardize natural resources." *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 966 (9th Cir.1983). In *Watt,* the Ninth Circuit affirmed the denial of an injunction against implementation of a desert conservation plan not prepared in accordance with NEPA. The court reasoned that enjoinment of the plan would subject desert resources to permanent damage from increased recreational use, a harm of greater concern than noncompliance with the planning process set forth in NEPA. *See id.*

■ No similar countervailing public interest counsels against an injunction in this case. The primary public interest Defendants advocate is almost purely economic in nature. In the preliminary injunction proceedings, Defendants argued

---

17. A cumulative impact on the environment "results from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions. . . ." 40 C.F.R. § 1508.7.

that enjoinment of the lobster fishery would inflict financial harm valued at a million to nearly two million dollars. *See* Defs.' Mem. Pts. Auths. Opp. Pls.' Mot. Prelim. Inj. at 22. Defendants are reminded that "NEPA's purpose is 'to protect the environment, not the economic interests of those adversely affected by agency decisions.'" *Western Radio Servs. Co. v. Espy,* 79 F.3d 896, 902–03 (9th Cir. 1996) (quoting *Nevada Land Action Ass'n v. United States Forest Serv.,* 8 F.3d 713, 716 (9th Cir.1993)). Surely, Congress did not intend that the interest in preventing financial loss outweigh the interest in environmental protection whenever the two clash, as they often do. Financial harm is not the sort of "unusual circumstance" contemplated in *Watts* which justifies a court's refusal to enjoin NEPA violations.

Defendants also claim that an injunction would disserve the interest in collection of data on the lobster fishery. An injunction would not necessarily realize Defendants' concern. The Court can fashion an injunction that protects the health of the lobster stocks at the same time it permits data collection for the purpose of informing future conservation efforts.

For the foregoing reasons, Plaintiffs are entitled to injunctive relief with regard to the lobster fishery.

### C. *The Bottomfish Fishery*

Plaintiffs move to enjoin the continued implementation of the Bottomfish FMP. An injunction would be appropriate, if at all, on the basis of Defendants' violations of Section 9 of the ESA and NEPA. The Court is persuaded that it needs more information before deciding whether to enter an injunction. The Court is concerned that participants in the bottomfish fishery, unlike Intervenor, are unrepresented in this suit. Although it is a safe assumption that those active in the fishery (if represented) would join NMFS in opposing an injunction, the Court cannot assume that they share identical interests with NMFS. Without the aid of more information regarding the bottomfishing industry, the Court cannot adequately and accurately assess the likelihood of future irreparable harm and the public interest at stake.[18] For this reason, the Court will hold an evidentiary hearing to collect the necessary information. Participants in the fishery may testify at this hearing or, in addition, submit written testimony to the Court. The Court reserves ruling on the motion for a permanent injunction against implementation of the Bottomfish FMP until the hearing is complete.

### CONCLUSION

The Court finds the following claims moot and grants summary judgment to Defendants accordingly: (1) the Section 7 claim pertaining to the Crustacean FMP is moot to the extent Plaintiffs seek a judicial order requiring NMFS to reinitiate formal consultation; (2) the Section 7 claim pertaining to the Bottomfish FMP; and (3) the NEPA claims to the extent Plaintiffs seek a judicial order requiring NMFS to prepare new EISs for both fisheries. The Court further finds that Plaintiffs are entitled to summary judgment on the following claims: (1) the Section 7 claim pertaining to the Crustacean FMP to the extent Plaintiffs seek a judicial determination that past consultation efforts are in violation of the ESA and the APA; (2) the Section 9 claim pertaining to the bottomfish fishery.

---

18. NMFS does inform the Court of what, in its view, is the public interest that would be affected by closure of the bottomfish fishery. According to NMFS, landings from 1987 to 1999 for the fishery have averaged $1.2 million. *See* Lent Decl. of Sept. 29, 2000 ¶ 20. There were thirteen boats active in the fishery in 1999, seven of which engage in bottomfishing exclusively. According to NMFS, there are no viable alternative fisheries for these boats and the resale value of these vessels is minimal in the absence of the bottomfish fishery. Closure of the fishery would allegedly result in a sunk cost of approximately $150,000 to $250,000 per vessel. *See id.* ¶ 21. Although this information is helpful, it is no substitute for information gleaned from the participants in the bottomfish fishery themselves.

A question of material fact precludes the Court from granting summary judgment to either party as to the Section 9 claim pertaining to the lobster fishery. In accordance with the foregoing, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion for summary judgment and GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment.

The Court further GRANTS Plaintiffs' motion for a permanent injunction with respect to the Crustacean FMP. Defendants are enjoined from implementing the Crustacean FMP until the Court receives notice that both the biological opinion and the EIS currently being prepared in connection with the FMP are complete and have been issued. Accordingly, the lobster fishery is to remain inactive until such time. Defendants may implement a program that engages in lobster fishing for the limited purpose of data collection, such as a catch and release program. Defendants must serve notice on the Court and all parties to this action before implementing any such program; otherwise prior leave of the Court is not required.

The Court reserves ruling on Plaintiffs' motion for a permanent injunction with respect to the Bottomfish FMP.

IT IS SO ORDERED.