**CALIFORNIA TROUT, INC., Plaintiff,**

v.

**UNITED STATES BUREAU OF RECLAMATION, et al., Defendants.**

Case No. CV 14–7744 FMO (PLAx)

United States District Court, C.D. California.

Signed June 22, 2015

Brian Segee, Ojai, CA, Margaret Morgan Hall, Santa Barbara, CA, Nicole Gildersleeve Di Camillo, Santa Barbara, CA, for Plaintiff.

Rickey Doyle Turner, Jr., US Department of Justice, Denver, CO, for Defendants.

## ORDER Re: PENDING MOTIONS

Fernando M. Olguin, United States District Judge

Having reviewed and considered all the briefing filed with respect to Federal Defendants' Motion to Dismiss Plaintiff's Complaint as Moot ("Motion to Dismiss") and the Joint Applicants' Motion to Intervene ("Motion to Intervene") (collectively, "Motions"), the court concludes that oral argument is not necessary to resolve the Motions. *See* Fed.R.Civ.P. 78; Local Rule 7–15; *Willis v. Pac. Mar. Ass'n,* 244 F.3d 675, 684 n..2 (9th Cir.2001).

## INTRODUCTION

California Trout, Inc. ("California Trout" or "plaintiff") filed a Complaint against the United States Bureau of Reclamation ("the BOR"); Lowell Pimley, Acting Commissioner of the BOR; the United States Department of the Interior ("the DOI"); and Sally Jewell, Secretary of the DOI (collectively, "defendants") for violations of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* In particular, plaintiff alleges that the BOR has not complied with the biological opinion ("BiOp")[1] and the accompanying incidental take statement ("ITS")[2] issued by the National Marine Fisheries Service ("NMFS") in 2000. (*See* Complaint for Declaratory and Injunctive Relief ("Complaint") at ¶¶ 55–74). Plaintiff alleges that such non-compliance has resulted in violations of Sections 7(a)(2) and 9 of the ESA. (*See id.* at ¶¶ 75–93). Plaintiff seeks declaratory and injunctive relief with respect to both claims. (*See id.* at Prayer for Relief).

On January 20, 2015, the Cachuma Conservation Release Board ("CCRB"), the Santa Ynez River Water Conservation District ("Parent District"), and the Santa Ynez Water Conservation District, Im-

---

1. A BiOp determines whether an agency's action will likely jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of its critical habitat. *See* 50 C.F.R. § 402.14(g). For further discussion of BiOp requirements, *see* Discussion, § I, *infra.*

2. A BiOp may conclude that jeopardy and destruction or adverse modification of critical habitat is not likely and determine that an incidental take would not violate the ESA. In that case, NMFS issues an ITS to specify the impact of the incidental taking and set out measures that will minimize the impact. *See* 16 U.S.C. § 1536(b)(4)(C). For further discussion of ITS requirements, *see* Discussion, § I, *infra.*

provement District No. 1 ("ID No. 1") (collectively, the "Cachuma Users") jointly requested to intervene in the action as defendants. (*See* Motion to Intervene at 2). The Cachuma Users assert that they "hold a substantial interest in the outcome of this litigation[,]" and that the "federal Defendants do not adequately represent [their] interests[.]" *(See id.* at 3).

Defendants subsequently filed their Motion to Dismiss, arguing that plaintiff's claims are moot because the complaint no longer presents a case or controversy. (*See* Motion to Dismiss at 12).

## FACTUAL BACKGROUND

This case "challenges BOR's ongoing failure to adequately operate the Hilton Creek Watering System ('System') under the Cachuma Project." (*See* Complaint at ¶ 6). The Cachuma Project supplies water for several local water agencies in Santa Barbara County, California. (*See id.* at ¶ 7). The Cachuma Project "includes the operation of Bradbury Dam and its associated water-transport and delivery structures on or near the Santa Ynez River. Bradbury Dam ('the Dam') is located about twenty-five miles northwest of Santa Barbara, California on the Santa Ynez River, and its installation formed the Cachuma Reservoir." (*Id.* at ¶ 7). The parties do not dispute that the BOR's operation of the Cachuma Project, the Dam, and the System is subject to the requirements of the ESA. (*See* Complaint at ¶ 11; Motion to Dismiss at 5).

In 2005, Hilton Creek, a tributary of the Santa Ynez River located downstream of the Dam, was designated a "critical habitat" for endangered Southern California steelhead ("steelhead"). (*See* Complaint at ¶¶ 6 & 10). Accordingly, pursuant to the ESA, NMFS prepared a BiOp in 2000 that requires the BOR to send water—through releases from the Cachuma Reservoir—

into Hilton Creek in order to support the steelhead. (*See* Complaint at ¶ 11; Motion to Dismiss at 5–6). The BiOp also contains an ITS, which describes the amount of anticipated "take" of steelhead associated with the operation of the Cachuma Project. (*See* Complaint at ¶ 12; Motion to Dismiss at 6). Plaintiff alleges that in the BiOp, "NMFS determined that the project would result in incidental take of Southern California steelhead and issued an ITS anticipating a limited amount of take ... wherein the only anticipated mortalities are associated with migrant trapping activities." (*See* Complaint at ¶ 48). The only mortalities authorized under the ITS are "one (1) adult unintentional mortality and four (4) juvenile mortalities associated with migrant trapping." (*Id.* at ¶ 56).

The ITS contains two "reasonable and prudent measures," among others, with which the BOR must comply to limit steelhead take. First, it must maintain flows into Hilton Creek at levels no lower than two cubic feet per second. Second, the steelhead must be rescued and relocated should the water release mechanisms fail. (*See* Complaint at ¶ 15; Motion to Dismiss at 6). In order to meet these obligations, the BOR operates the System with two electric-powered pumps and a permanent water supply line from Lake Cachuma to Hilton Creek. (*See* Motion to Dismiss, Exhibit ("Exh.B"), Draft Biological Assessment for the Operation and Maintenance of the Cachuma Project, November 2013 ("Draft BA") at 643 [3]). Under normal hydrologic conditions, the water system is gravity-fed and does not rely on pumps. (*See id.*). However, when the water levels in Lake Cachuma drop below 730 feet, the system relies on the two pumps to sustain the flows of water into Hilton Creek required by the ITS. (*See* Motion to Dismiss, Exh. C, Summary of Actions Subsequent

3. All exhibit page numbers refer to the ECF Page ID numbers.

to Re–Initiation of Consultation on Cachuma Project Operations in Relation to ESA Section 7(d) Limitations on Commitment of Resources ("7(d) Finding") at 1037).

In early 2013, water levels at Lake Cachuma dropped below 730 feet. (*See id.*). Since then, the System has depended upon the two electric-powered pumps to provide the necessary flows to Hilton Creek. (*See id.*). Plaintiff alleges that since March 2013, there have been at least 11 malfunctions with the System's pump infrastructure, "many of which have interrupted flows into Hilton Creek, and at least six (6) of which have resulted in a total of at least 393 fish mortalities." (Complaint at ¶ 59). Not only did this violate the BOR's take allowance, plaintiff alleges, but because the BOR failed to comply with the terms and conditions of the ITS—including maintaining adequate water flows and relocating stranded steelhead—it cannot benefit from the safe harbor from Section 9 liability that compliance with an ITS would otherwise provide. (*See id.* at ¶¶ 81–84).

On May 27, 2014, a little over a year after the various breakdowns of the System began, the "BOR requested reinitiation of [Section 7] consultation on the Cachuma Project." (Complaint at ¶ 49). According to plaintiff, the BOR failed "to immediately reinitiate consultation in response" to each ITS violation as required by regulation. (*See id.* at ¶ 90). Further, although it has reinitiated formal consultation, plaintiff alleges that the BOR has not reinitiated formal consultation "specifically address[ing] incidental take" of steelhead caused by infrastructure failures. (*See id.* at ¶ 49).

Plaintiff alleges that "[w]hile BOR initiated some repairs," several fixes require installation of an Emergency Backup Delivery System ("Emergency System"), which has yet to be implemented. (*See* Complaint at ¶¶ 71–74). "[U]ntil installation of the Emergency System is complete,

multiple fixes to the [System] will not be completed and thus continued future take of Southern California steelhead remains imminent." (*Id.* at ¶ 74). Further, the "BOR has indicated that the Emergency System itself is temporary and that a Hilton Creek Permanent Backup System ("Permanent System") is required to ensure adequate and consistent flows into Hilton Creek." (*Id.* at ¶ 74). The Permanent System "is not yet developed and will not be implemented until approximately 2016." (*Id.*).

## LEGAL STANDARDS

### I. MOTION TO DISMISS.

 Defendants have moved to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). (*See* Motion to Dismiss at 11). When ruling on a motion to dismiss for lack of subject matter jurisdiction, the court takes the allegations in the complaint as true. *See, e.g., Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 944–45 (9th Cir.1999). However, the court is not restricted to the face of the pleadings and "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). When such evidence is offered, the Rule 12(b)(1) motion becomes a factual instead of a facial one. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir.2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." (*Id.*). "If the moving party converts the motion to dis-

miss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *(Id.)* (internal quotation marks omitted).

If the extrinsic evidence produced is disputed, the court can weigh the evidence and determine the facts in order to satisfy itself that it has the power to hear the case. *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987). In the absence of an evidentiary hearing, disputed facts relevant to subject matter jurisdiction are viewed in the light most favorable to the non-moving party. *See Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996). Because jurisdiction is a threshold question, it must be determined at the outset of a case. *See, e.g., Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (internal quotation marks and alteration omitted).

## II. MOTION TO INTERVENE.

Under Federal Rule of Civil Procedure 24(a) ("Rule 24(a)"), a court must permit any party to intervene in a lawsuit who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest. Fed.R.Civ.P. 24(a)(2). The rule is broadly construed in favor of intervention. *See Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1061 (9th Cir.1997),

*cert. denied*, 524 U.S. 926, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998). The Ninth Circuit employs four criteria to determine whether intervention under Rule 24(a) is appropriate: (1) the motion to intervene must be timely; (2) the applicant must have a significantly protectable interest related to the property or transaction that is the subject of the action; (3) the applicant must be situated such that the disposition of the action may impair or impede the party's ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir.2003). The burden falls on the applicant to show that all of the requirements for intervention have been met. *See U.S. v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir.2004).

Under Federal Rule of Civil Procedure 24(b) ("Rule 24(b)"), a court may grant permissive intervention where (1) the applicant shows independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense and the main action share a common question of law of fact. *See Freedom from Religion Foundation, Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir.2011). In exercising its discretion on an application for permissive intervention, the court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed.R.Civ.P. 24(b)(3).

## DISCUSSION

### I. THE ESA.

Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people[,]" Congress enacted the ESA to "provide a program for the conservation of ... en-

dangered species and threatened species," and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[.]" 16 U.S.C. § 1531(a)(3) & (b). The ESA defines "conservation" as "the use of all methods and procedures that are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). Accordingly, the primary purpose of the ESA is not simply to prevent the extinction of endangered species, but to recover them to the point where the protections of the ESA are no longer needed. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995) (noting that Congress' intent in enacting the statute "was to halt and reverse the trend toward species extinction, whatever the cost.").

■ The ESA implements these goals through, among other things, Sections 7 and 9, which are at issue in this case. Section 9 prohibits the taking of any endangered species. 16 U.S.C. § 1538(a). The ESA defines the term "take" to include "harass, harm,[4] pursue, hunt, shoot, wound, kill, trap, capture, or collect[.]" *Id.* at § 1532(19). "Take" includes indirect as well as direct harm and need not be purposeful. *See Babbitt*, 515 U.S. at 704–05, 115 S.Ct. at 2416.

Section 7(a)(2) of the ESA requires that federal agencies such as the BOR ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a critical habitat. 16 U.S.C. § 1536(a)(2). If an agency's action may affect a listed species, the agency must undergo consultation—here, with NMFS—to prepare a biological assessment. *See* 16 U.S.C. § 1536(c). After preparing a biological assessment, if NMFS determines that the action is likely to adversely impact the listed species, it must undergo formal consultation[5] and prepare a BiOp to determine whether the action will likely jeopardize the continued existence of the listed species or result in the destruction or adverse modification of its critical habitat. 50 C.F.R. § 402.14(g).

If the NMFS BiOp concludes that jeopardy and destruction or adverse modification of critical habitat is not likely and determines that an incidental take[6] would not violate Section 7(a)(2), it must provide an ITS. An ITS must specify the impact of the incidental taking on the species, specify reasonable and prudent measures that are necessary and appropriate to minimize the impact, and set forth the terms and conditions with which the federal agency must comply. *See* 16 U.S.C. § 1536(b)(4)(C). This provision provides a limited exception, or safe harbor, to the

---

4. The term "harm" is further defined by NMFS regulations as an act which kills or injures fish or wildlife, including "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

5. Section 7 consultation may be formal or informal. If the agency concludes that the action "may affect," but "is not likely to ad-

versely affect any listed species or critical habitat," and the consulting agency agrees in writing, the informal consultation process is terminated, and no further action is necessary. *See* 50 C.F.R. §§ 402.13(a) & 402.14(b)(1).

6. "Incidental takes" are defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02.

prohibition on take under Section 9. *See id.* at § 1536(*o*)(2). Taking that is "in compliance with the terms and conditions" in the ITS is "not a prohibited taking" under Section 9. *See* 50 C.F.R. § 402.14(i)(5). In other words, the exception to the take prohibition of Section 9 only covers actions "contemplated by an [ITS] issued under Section 7 of the ESA and ... conducted in compliance with the requirements of that statement." *Ramsey v. Kantor,* 96 F.3d 434, 442 (9th Cir.1996).

The regulations specify that the agency "must reinitiate [Section 7] consultation immediately" "if during the course of the action the amount or extent of incidental taking, as specified [in the ITS], is exceeded[.]" 50 C.F.R. § 402.14(i)(4); *see also* 50 C.F.R. § 402.16 (requiring reinitiation of consultation where the action is authorized by law and (a) "the amount or extent of taking specified in the [ITS] is exceeded[.]"). While Section 7 consultation is ongoing, Section 7(d) of the ESA allows agencies to proceed with the action so long as it does not result in "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing ... any reasonable and prudent alternative measures" which would not jeopardize the continued existence of any endangered or threatened species or result in adverse habitat modification. *See* 16 U.S.C. §§ 1536(d) & (a)(2).

## II. MOTION TO DISMISS.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *See* U.S. Const. art. III, § 2. Therefore, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision[.]" *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). This re-

quirement continues throughout all stages of litigation, and "a suit becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome[.]" *See Chafin v. Chafin,* —— U.S. ——, 133 S.Ct. 1017, 1019, 185 L.Ed.2d 1 (2013) (internal quotation marks omitted). The burden to establish mootness is high. *See, e.g., Nw. Envt'l Def. Ctr. v. Gordon,* 849 F.2d 1241, 1244-45 (9th Cir.1988) (stating that the central "question is whether there can be *any* effective relief.") (emphasis in original); *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1065 (9th Cir.2002) ("[A] case is moot only where no effective relief for the alleged violation can be given.").

Defendants argue that because the BOR has "reinitiated Section 7 consultation, replaced or refurbished the two watering-system pumps, and is in the process of installing an emergency backup delivery system, Plaintiff's complaint is moot in its entirety." (Motion to Dismiss at 12). With respect to its Section 9 claim, plaintiff argues in response that "reinitiation of consultation under Section 7 does not moot a Section 9 claim based on violation of, or take outside the scope of, an ITS." (*See* Opp. at 9). Further, it asserts that the claim is not moot because there is still a likelihood of steelhead take, and the court can grant effective injunctive and declaratory relief in order to address that likelihood and mitigate for past harms. (*See id.*). Plaintiff further asserts that "[r]einitiation of consultation does not moot a Section 7 consultation claim when consultation was not triggered by, and does not address, the complained of ITS exceedance." (*See id.* at 17). Moreover, it argues, "consultation does not preclude this Court from granting both injunctive and declaratory relief for the Section 7 consultation claim in this case." (*Id.*). The ar-

guments with respect to each of plaintiff's claims are addressed in turn below.

A. *Section 7 Claim.*

As defendants assert, there can be no dispute that the agencies involved "have in fact reinitiated formal consultation and have even entered into a written agreement outlining the steps for the consultation." (Motion to Dismiss at 13). In some cases, Section 7 reinitiation claims become moot when the agency requests reinitiation of consultation. *See, e.g., Greenpeace Found. v. Mineta,* 122 F.Supp.2d 1123, 1127–28 (D.Haw.2000) (plaintiff's claim for reinitiation was moot because the agency had already requested reinitiation, and "[i]t would serve no purpose to order [the agency] to do what it has already done."); *Am. Littoral Soc'y v. EPA,* 199 F.Supp.2d 217, 245–47 (D.N.J.2002) (finding that a claim for failure to consult under Section 7(a)(2) was moot where the agency had sent letters to resource agencies seeking consultation); *Southwest Center for Biological Diversity v. U.S. Forest Serv.,* 82 F.Supp.2d 1070, 1079 (D.Ariz.2000) (finding a claim for failure to consult under Section 7(a)(2) moot where the agencies had begun consultation, noting the "settled rule against issuing advisory opinions.").

Importantly, however, courts have found that all that becomes moot is the request for reinitiation of formal consultation; other requested remedies are not necessarily mooted. *See, e.g., Greenpeace,* 122 F.Supp.2d at 1128 (finding mootness with respect to reinitiation of formal consultation but stating that "[t]he claim is not moot, however, to the extent it seeks summary adjudication that past consultation efforts fell short of Section 7 requirements."). In 2011, the District of Arizona explained this concept when it described the finding of mootness in its earlier *Southwest Center* case:

[I]n that case there was literally no other relief that could be granted to plaintiffs. Southwest Center sought a declaratory judgment that the Forest Service had failed to fulfill its obligation to consult. Because all Southwest Center sought was reinitiation of consultation, and because consultation had already been reinitiated, the Court felt there was no other relief that it could grant. In [another case] the court likewise held that a declaratory judgment would serve no purpose because the only relief plaintiffs sought was reinitiation of consultation, but the defendants had already reinitiated consultation. However, the court also specifically stated: This is not to say that a violation of section 7(a)(2) could always be cured by subsequent consultation, nor is this general approval for consultation after the fact. Instead, this merely recognizes that the changed circumstances of *this* particular case no longer present an opportunity for meaningful relief.

*Center for Biological Diversity v. U.S. Forest Serv.,* 820 F.Supp.2d 1029, 1036–37 (D.Ariz.2011) (internal quotation marks omitted; emphasis in original) (citing *Southern Utah Wilderness Alliance v. Smith,* 110 F.3d 724, 729 (10th Cir.1997)). Thus, although reinitiation of Section 7 consultation can moot a claim, the specific relief requested by the plaintiff must be taken into account. If reinitiation of consultation is all plaintiff seeks, the claim may be moot; a request for additional remedies, however, may still present a live controversy.

Other remedies remain viable despite reinitiation of consultation. For example, in *Natural Resources Defense Council v. Jewell,* 749 F.3d 776 (9th Cir.), *cert. denied,* —— U.S. ——, 135 S.Ct. 676, 190 L.Ed.2d 389 (2014), plaintiffs' reinitiation claim was not rendered moot by the issuance of a BiOp following completed consultation because the BiOp did "not represent

a consultation" concerning the impacts to endangered species identified by plaintiffs. *See id.* at 782. Similarly, in *Strahan v. Roughead,* 910 F.Supp.2d 358 (D.Mass. 2012), plaintiff's Section 7 claim was not moot, despite reinitiation of consultation, because the consultation did not address "the entire range" of challenged activities. *Id.* at 378–80. In these cases, remedies are still available because both parts of the remedy sought, *i.e.,* (a) addressing a particular problem (b) through reinitiation of consultation, would not necessarily be provided through reinitiation of consultation alone.

Moreover, consultation does not moot a Section 7 reinitiation claim if the conduct is ongoing and non-compliance with monitoring requirements is likely to persist. Indeed, "[i]t is well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements." *Washington Toxics Coal. v. EPA,* 413 F.3d 1024, 1034 (9th Cir.2005), *cert. denied,* 546 U.S. 1090, 126 S.Ct. 1024, 163 L.Ed.2d 854 (2006). In one case, *Oregon Natural Desert Ass'n v. Tidwell,* 716 F.Supp.2d 982 (D.Or.2010), the court found that even though consultation had been reinitiated, "declaratory relief remains available, as is future injunctive relief. In particular, the coming grazing season will be managed under the [original] BiOp and declaratory judgment that the Forest Service violated the ESA by failing to timely reinitiate formal consultation could provide effective relief." *Id.* at 995; *see also WildEarth*

*Guardians v. U.S. Forest Serv.,* 2011 WL 11717438, *5 (D.Ariz.2011) (finding that defendant was "unable to comply with the ... BiOp [so] there could be ongoing and future harm to [the species]. Therefore, there is still a present and live controversy.").

■■■ Here, the BOR reinitiated consultation. (*See* Draft BA). It submitted to NMFS a revised biological assessment on the effects of the Cachuma Project's continued operation and maintenance. (*See id.*). NMFS has accepted the Draft BA and has reinitiated consultation to produce a new, superseding BiOp. (*See* Motion to Dismiss, Exh. G, April 8, 2014 Letter at 1167). Defendant argues that "[t]he agencies, as part of the ongoing consultation on the entire Project, are required to consider the incidental take issues at Hilton Creek as part of the 'Status of the Species' and 'Environmental Baseline' analyses that are part of every consultation and [BiOp]." (Motion to Dismiss at 14 (citing 50 C.F.R. § 402.14(g))).[7] Defendant further states that steelhead take resulting from pump failures "will be a major part of the consultation analysis," (*See* Motion to Dismiss at 14; *see also id.* at 15 (consultation "will clearly involve an analysis of the steelhead take[.]"). Accordingly, defendants argue, "there is no effective relief the Court can grant with respect to Plaintiff's request for an order requiring Defendants 'to address, through reinitiated formal consultation ... the effects of the incidents of take in ex-

---

7. The court also notes the statements in the 7(d) Finding, which states that the agencies will consider as part of the re-consultation process the "Hilton Creek flow interruptions and the resulting steelhead take[.]" (*See* 7(d) Finding at 1038). "Also as part of the ongoing consultation, consideration of the effects of the Cachuma Project on steelhead, which includes Hilton Creek operations, are included in Reclamation's 2013 BA and are therefore part of the reinitiated consultation with NMFS." (*Id.*). However, the document was written after the Complaint was filed and it was not part of the documentation considered for reinitiation of consultation. Accordingly, the court gives the 7(d) Finding less weight than those documents written for the purpose of reinitiating consultation. *See Roberts,* 812 F.2d at 1177 (the court can weigh the evidence on a factual motion to dismiss); *Dreier,* 106 F.3d at 847 (the court should view disputed facts in the light most favorable of the non-moving party).

ceedance of that allowed under the [ITS.]'" (Motion to Dismiss at 15 (citing Complaint at 22, Request for Relief)).

The court is unpersuaded that the exceedance of steelhead take under the ITS due to pump failures was the primary reason for reinitiation of consultation. Further, taking plaintiffs' allegations as true—which the court must do at this stage—it is unclear whether the BOR complied with its ESA obligation (*See* 50 C.F.R. § 402.14(i)(4)) to reinitiate consultation immediately.[8] (*See* Complaint at ¶ 17). As the 460–page Draft BA reflects, "the reasons for reinitiation are many and the data and analysis are detailed and complicated." (*See* Reply in Support of Federal Defendants' Motion to Dismiss Plaintiff's Complaint as Moot ("Reply") at 6). What is clear, however, is that the BOR contemplated that an analysis of the System, the pumps, and the resulting steelhead take, would be taken into account in the consultation. That the Draft BA did not address specifics such as the number of pump failures and the number of steelhead mortalities associated with each does not change this conclusion; the BOR reported each failure to NMFS, and it appears that there was communication between the agencies regarding the issue since the first incident in March 2013. (*See* Motion to Dismiss,

Exhs. D and E, Incident Reports and Related Correspondence; *see also* Exh. F, Letter Re Endangered Species Act Section .7(a)(2) Concurrence for the Hilton Creek Emergency Backup Water Supply System, dated August 4, 2014, ("Concurrence Letter") at 1164 (describing the habitat conditions for steelhead and explaining that the BOR "has determined that a backup water-supply system . . . is necessary to ensure the existing Hilton Creek water system provides more reliable flow throughout Hilton Creek . . . to the Santa Ynez River confluence")). Taken together, the Draft BA and the other documents indicate that the impacts to steelhead identified by plaintiffs will be analyzed through the course of the consultation.[9]

However, that the System, the pump failures, and the resultant steelhead take will be analyzed does not mean that plaintiff's requests for relief other than consultation, such as injunctive or declaratory relief, are moot. As described previously, consultation does not moot reinitiation claims when the challenged conduct is ongoing. Here, the BOR acknowledges that it has not yet implemented a permanent fix to the System pumps, and that flow interruptions have been ongoing since March 2013. Recent improvements have "reduced the severity and risk of future flow

---

8. It does however appear from the Draft BA that the BOR intends to address the steelhead take due to pump failures as part of the consultation process. The Draft BA states:

 [T]he [System] is subject to accidental malfunctions which can result in steelhead take. Recent incidents have pointed to areas where system redundancy and operational improvements can increase the reliability of the system, thus minimizing the potential for future failures. [The BOR] is committed to implementing measures to improve operations of the [System] allowing for water releases to continue to contribute to steelhead population growth. Designs are underway for a system that will allow for continuous pump operation dur-

ing power outages and for an [alternative System], both of which will increase the reliability of the [System] and reduce the likelihood of rare system failures.

(Draft BA at 1013; *see also id.* at 890 ("Although the [System] operated without failure for 12 years, rare system failures are possible as occurred in the two brief incidents in 2013 resulting in an interruption of flows and [steelhead] relocation and mortality.").

9. Should the administrative record or other evidence suggest that is not the case, the court may determine that an order that defendants address the effects of the incidents of take in exceedance of the ITS through formal consultation is appropriate. (*See* Complaint at 22, Request for Relief).

interruptions" (*See* 7(d) Finding at 1038), but the BOR cannot foreclose the possibility of future harm to steelhead in Hilton Creek. Since the Complaint was filed on October 6, 2014, there have been five additional incidents that were reported to NMFS. (*See* 7(d) Finding at 1042). Although these incidents caused no mortalities and only necessitated rescue of two steelhead, there may still be future harm until the Emergency System and/or the Backup System are in place. (*See* Complaint at ¶¶ 71–74). As in *WildEarth,* there "could be ongoing and future harm" to steelhead, and therefore there is still a present and live controversy. 2011 WL 11717438 at *5.

Plaintiff has also requested declaratory relief related to defendants' alleged violation of Section 7(a)(2) by failing to reinitiate consultation immediately with NMFS after the first take that exceeded the amount allowed under the current ITS. (*See* Complaint at 22, Prayer for Relief). If the court determines that the regulation requiring immediate consultation (*See* 50 C.F.R. § 402.14(i)(4)) was not adhered to in this case, declaratory or injunctive relief may be appropriate to ensure that defendants follow such regulations in the future. *See, e.g., Oceana, Inc. v. Pritzker,* 75 F.Supp.3d 469, 497, 2014 WL 7174875, at *19 (D.D.C.2014) (remanding an ITS to an agency and highlighting the plaintiff's "valid concern" that the agency's existing procedure was not effective in identifying when take would occur and when take limitations might be exceeded).

For the reasons stated above, the court finds that plaintiff's Section 7 claim presents a live case or controversy that may be remedied by injunctive and/or declaratory relief.

### B. *Section 9 Claim.*

Defendants assert that "the only remedy for [plaintiff's Section 9] claim is reinitiation of consultation[,]" and because defendants have already reinitiated consultation, the claim is moot. (*See* Motion to Dismiss at 16). In support of their assertion, defendants cite 50 C.F.R. § 402.16(a) and (c), which state that "[r]einitiation of formal consultation is required" in certain circumstances. By no means do these regulations state that such consultation is the only remedy available for Section 9 claims, nor do the cases cited by defendants. (*See* Motion to Dismiss at 17). On the contrary, case law illustrates that takes outside the scope of an ITS can give rise to the requirement to reinitiate consultation *and* liability for violation of Section 9. *See, e.g., Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.,* 273 F.3d 1229, 1249 (9th Cir. 2001) (stating than an ITS "set[s] forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, *and* requiring the parties to reinitiate consultation.") (emphasis added); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,* 629 F.Supp.2d 1123, 1132–33 (E.D.Cal.2009) ("[W]hen the terms of an ITS are violated, the agency is liable under section 9[,]" and "an agency's violation ... *may also* cause an actionable violation of [Section 7].") (emphasis added).

Further, even if reinitiation of consultation has occurred, injunctive and declaratory relief remain available for Section 9 claims where the challenged action is ongoing. *See Greenpeace,* 122 F.Supp.2d at 1129 (D.Haw.2000) (finding that a Section 9 claim was not moot because defendant "has not shown that the harm underlying [the claims] has been eradicated, never to return."); *Defenders of Wildlife v. Martin,* 454 F.Supp.2d 1085, 1099 (E.D.Wash.2006)

(granting a preliminary injunction and citing "evidence of past takes and likelihood of future harms[,]" which indicated that "violation of § 9's prohibition against 'take' in the form of harassment and harm are likely in the future.").

Here, as discussed above with respect to the Section 7 claim, plaintiff has shown past harm and take, as well as the potential for future harm and take. The BOR's efforts to develop a more effective and reliable means for ensuring the functionality of the System illustrate that the current structure is still prone to failures that may result in the continued take of steelhead. In fact, in its 7(d) Finding, the BOR recognizes that it is prohibited from making irreversible commitments of resources during the consultation process. (*See* 7(d) Finding at 1038–41 (stating that its recent modifications did not make "an irreversible or irretrievable commitment of resources ... and do not have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives[.]"). Such statements highlight that future harm to steelhead may occur, for which injunctive and/or declaratory relief may be appropriate. Accordingly, plaintiff's Section 9 claim is not moot.

### C. *Prudential Mootness.*

■■■■■ Defendants argue in the alternative that "[e]ven if this Court were to find that some of Plaintiff's claims are not moot under Article III, this Court should exercise its discretion and dismiss Plaintiff's claims under the doctrine of prudential mootness." (Motion to Dismiss at 19). The Ninth Circuit has explained that prudential mootness "permits a court to dismiss [a case] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief[.]" *Deutsche Bank Nat. Trust Co. v. F.D.I.C.*, 744 F.3d 1124, 1135 (9th Cir.2014) (internal quotation marks omitted). Under the doctrine:

[T]here are circumstances under which a controversy, not constitutionally moot, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant. Where it is so unlikely that the court's grant of remedy will actually relieve the injury, the doctrine of prudential mootness—a facet of equity—comes into play. This concept is concerned, not with the court's power under Article III to provide relief, but with the court's discretion in exercising that power.

*Nasoordeen v. F.D.I.C.*, 2010 WL 1135888, at *6 (C.D.Cal.2010) (internal quotation marks and citation omitted).

■■■■■ Defendants assert that the BOR, "by its own volition and well before Plaintiff filed its complaint, completed, or is soon to complete, every remedy Plaintiff demands. As a result, no meaningful relief can be provided to plaintiff." (*See* Motion to Dismiss at 19). As discussed in detail above, however, the BOR has yet to finalize its repairs to the System, and it has not finalized design or begun implementing a permanent fix to the system. Courts have refused to dismiss claims as prudentially moot in similar circumstances. *See, e.g., WildEarth*, 2011 WL 11717438 at *6 (finding that plaintiff's claims were not prudentially moot even though defendants had reinitiated consultation because of continued impact of defendants' actions upon the endangered species). This case raises the same concerns. If the court ultimately finds it appropriate, it could grant meaningful injunctive and declaratory relief for plaintiff's claims.

### D. *Alternative Request to Stay the Litigation.*

■■■■■ In the alternative, defendants request that the court stay all proceedings

until consultation is completed and the emergency backup system is installed. (*See* Motion to Dismiss at 19). The power to stay proceedings is "incidental·to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936). The Ninth Circuit has found that a stay may be appropriate "pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character[.]" *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). A stay is appropriate when it will serve the interests of judicial economy by allowing for development of factual and legal issues, and when weighing of the hardships favors the granting of a stay. *See, e.g., Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir.2005) (Ultimately determining that "neither the balance of hardships between the parties, nor the prospect of narrowing the factual and legal issues in the other proceeding, justifies a stay."). However, the Ninth Circuit has cautioned that "if there is even a fair possibility that the stay will work damage to some one else, the party seeking the stay must make out a clear case of hardship or inequity." *Id.* (internal quotation marks and citation omitted).

■ Here, there is a possibility that a stay could damage plaintiff's interests. As described above, *see supra* at § II.A., there is still a risk of future harm to the steelhead in Hilton Creek, and there may be future harm until the Emergency System and/or the Backup System are in place. Although the court has no reason to believe they are intentional, there have been repair delays (*See* Declaration of Brian Trautwein in Support of Opposition to Motion to Dismiss, Exh. B at 1244; Exh. C at 1250 & 1252), and they may continue to occur. Additionally, there were many reasons behind the reinitiation of consultation, and the evidence may show that consultation was not reinitiated immediately after as a result of the steelhead take incidents. Relief by this court may assure that these incidents are taken seriously, and addressed adequately, throughout the ongoing consultation process. It is possible, therefore, that a stay and the subsequent completion of consultation could harm plaintiff's interests.[10]

Defendants assert that "[l]itigating this case would divert agency staff from carrying our their mission to complete the new ESA consultation." (*See* Motion to Dismiss at 20). However, diverting staff attention from other activities does not sufficiently satisfy the requirement of hardship or inequity. *See, e.g., Lockyer*, 398 F.3d at 1112 ("[B]eing required to defend a suit, without more, does not constitute a clear case of hardship or inequity.") (internal quotation marks omitted). For these reasons, the court denies defendants' request for a stay pending the completion of Section 7 consultation.

### III. MOTION TO INTERVENE.

The parties seeking to intervene in this matter are CCRB, the·Parent District, and ID No. 1. (*See* Motion to Intervene at 2). The CCRB is composed of and represents the City of Santa Barbara, Goleta Water District, and Montecito Water District, all of whom receive large parts of their water supply from, and import State Water Pro-

---

**10.** Although not necessary in this analysis, the court notes that a stay might lead to the completion of consultation and to the implementation of changes that would not take into account the significant interests of the Cachuma Users. *See infra* at § III.

ject water through, the Cachuma Project. (*See id.*). The Parent District protects the rights of water users downstream of the Cachuma Project, including those with riparian rights and users of groundwater replenished by Santa Ynez River flows. (*See id.*). The Parent District includes the Cities of Solvang, Buellton, and Lompoc, as well as the communities of Santa Ynez, Los Olivos, and Ballard. (*See id.*). It also includes over 30,000 acres devoted to irrigated agriculture. (*See id.*). Unlike the other Cachuma Users (CCRB and ID No. 1), the Parent District is not a "Cachuma Member Unit," and it is not entitled to the Santa Ynez River water the BOR appropriates for the Cachuma Project. (*See id.*). Instead, water users within the Parent District are dependent upon state-mandated "water rights releases" from the Bradbury Dam outlet works downstream of the Project, which are the Santa Ynez River flows that would have flowed downstream into the Parent District in the absence of the Cachuma Project. (*See id.* at 2–3).

Finally, ID No. 1 is a public agency that supplies water to Santa Ynez, Los Olivos, Ballard, and the City of Solvang (all members of the Parent District) and to various other areas and users within ID No. 1's boundaries in the Santa Ynez Valley. (*See id.* at 2). In a normal water year, water from the Cachuma Project makes up approximately 40% of ID No. 1's water supply. (*See id.*). An additional 25% of ID No. 1's total water supply is from downstream water production that depends upon water rights releases from Lake Cachuma, which are separate from ID No. 1's contractual Cachuma Project supplies. (*See id.*).

The Cachuma Users argue that their intervention meets the requirements of Rule 24(a) and 24(b). (*See* Motion to Intervene at 11, 21). Plaintiff disagrees and requests that the court deny the Motion to

Intervene as to the liability phase of the action and grant the Cachuma Users leave to intervene only as to the remedies phase, if one occurs. (*See* Response in Partial Opposition to Motion for Leave to Intervene ("Intervention Opp.") at 2).

### A. Rule 24(a).

 The Cachuma Users argue that they satisfy the Rule 24(a) requirements for intervention as of right because (1) their motion is timely; (2) they have a significant interest relating to the pending lawsuit; (3) disposition of the lawsuit may adversely affect their interests unless intervention is allowed; and (4) the existing parties do not adequately represent their interests. (*See* Motion to Intervene at 11). Plaintiff does not challenge the timeliness of the motion. (*See* Intervention Opp. at 5). The court agrees and finds that the Motion to Intervene is timely, as the court has not yet substantively engaged in the issues in the case (*see League of United Latin American Citizens v. Wilson*, 131 F.3d 1297, 1302–03 (9th Cir.1997), and the Motion to Intervene was filed before defendants responded to the Complaint. The court addresses the remaining Rule 24(a) factors below.

 "An applicant has a significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims." *U.S. v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir.2002) (internal quotation marks omitted). This is "not a clear-cut or bright-line rule, because no specific legal or equitable interest need be established. Instead, the interest test directs courts to make a practical, threshold inquiry, and is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and

due process[.]" *Id.* It is construed "broadly in favor of proposed intervenors." *See Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir.2011).

The court is persuaded that the Cachuma Users have significant protectable interests in the litigation. As they state, "[i]n numerous ways, [the Bradbury Dam and Hilton Creek System] operations directly impact the Cachuma Users with regard to their respective legal interests in contracts entitling them to shares of Cachuma Project water; the quantity, timing and measurement of priority downstream water rights releases; the delivery of [State Water Project] supplies to Lake Cachuma and for mixing to improve downstream water quality; and emergency Cachuma Water Project deliveries to ID No. 1." (*See* Motion to Intervene at 13).

Plaintiff's assertion that these interests are not related to the liability phase, *i.e.,* "the court's determination as to whether the BOR has violated the ESA[,]" (*See* Intervention Opp. at 6) is unavailing. The Cachuma users have an interest in the liability phase based on the various contracts and agreements—to which they are parties—that directly relate to the steelhead. Their water supply deliveries are structured around the 2000 NMFS BiOp in a number of ways. (*See, e.g.,* Declaration of Daniel E. Griset, dated January 15, 2015, at ¶ 8.d (describing the Settlement Agreement between CCRB and other parties that requires CCRB to comply with the BiOp, including the Parent District's maintenance of certain downstream water rights releases, which provide for conjunctive use of water rights releases with fish releases required by the BiOp)). ID No. 1

is a party to the Santa Ynez River/State Water Project Exchange Agreement ("Exchange Agreement"), which protects its right to use the Bradbury Dam outlet works and interconnected Santa Ynez Pipeline to receive emergency deliveries of Project water when State Water Project supplies are not available for exchange. (*See* Declaration of Chris Dahlstrom, dated January 16, 2015 ("Dahlstrom Decl.") at ¶¶ 10–11). ID No. 1's interest under the Exchange Agreement is directly advanced by the Settlement Agreement, which aims to improve the quality of water released from the Dam to the Santa Ynez River. (*See id.* at ¶¶ 15, 27). Further, ID No. 1 holds licenses issued by the State Water Resources Control Board to produce water from the underflow of the Santa Ynez River downstream of the Dam. (*See id.* at ¶ 6). These licenses are prior in right to the appropriative rights issued to the BOR for its operation of the Cachuma Project and the BOR's operation of the Project is expressly made subject to the protection of priority downstream water rights, including those held by ID No. 1. (*See id.*). In addition, the Cachuma Users help fund and implement the BiOp. (*See* Defendant–Intervenors Cachuma Users' Request for Judicial Notice in Support of their Reply to Plaintiff's Opposition to their Motion to Intervene, Exh. A, 2001 Memorandum of Understanding to Support Implementation of the National Marine Fisheries Service Biological Opinion and the Santa Ynez River Technical Advisory Committee Lower Santa Ynez River Fish Management Plan ("2001 MOU") at 1286).[11] In short, the Cachuma Users' water supply interests are entirely bound up with the operational

---

11. The court grants the Cachuma Users' Request for Judicial Notice of the 2001 MOU pursuant to Federal Rule of Evidence 201. *See* Fed.R.Evid. 201 ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately

and readily determined from sources whose accuracy cannot reasonably be questioned."); *see Lee v. City of Los Angeles,* 250 F.3d 668, 689–90 (9th Cir.2001) (stating that Federal Rule of Evidence 201 permits taking judicial notice of matters of public record).

regime established by the BiOp, the 2001 MOU, and other contracts. They therefore have a significant protectable interest in the liability stage of this case.[12]

As to the third and fourth Rule 24(a) factors, disposition of this action without the Cachuma Users' participation may impair or impede their ability to protect their interests, which are not adequately represented by the current parties. If they are not made party to this action, the Cachuma Users will have no way to ensure that their water supply, water rights, and related interests will not be adversely affected. Although defendants and the Cachuma Users share the objective of defeating plaintiff's ESA claims, their interests are not coextensive. The Cachuma Users' primary interest is the operation of the Cachuma Project in a manner that protects their water supplies and water rights, both in terms of quantity and quality, and protects their related legal and contractual interests. While defendants are responsible for operating the Project and allowing downstream water rights releases, they do not represent the interest of all Cachuma Users in ensuring State Water Project deliveries; defendants are not parties to the Settlement Agreement and its provisions to improve downstream water quality, and they are not parties to the Exchange Agreement and its provisions ensuring emergency Project supply deliveries to ID No. 1. The Cachuma Users may make arguments that differ from defendants' regarding the extent of the BOR's ESA obligations, particularly because reconciliation of those obligations with the Cachuma Users' contractual interests are critically important to the Cachuma Users. It is therefore possible, if not likely, that their interpretation of the BOR's obligations with respect to the ESA and the BiOp is different than defendants'. This is especially true given the fact that the BOR has undertaken temporary modifications to the System that it deems necessary to prevent steelhead take (See Motion to Dismiss at 10), and the Cachuma Users see those modifications as contrary to their interests and unnecessary under the ESA and BiOp (See Dahlstrom Decl. at ¶¶ 17–19). Defendants cannot adequately represent the numerous legally protected interests held by the Cachuma Users that could be adversely impacted by Plaintiff's lawsuit.

Plaintiff recognizes some of the points described in the preceding paragraph, but argues that these interests mean only that the Cachuma Users' intervention is appropriate in the remedies phase of the litigation. (See, e.g., Intervention Opp. at 6). The court disagrees and finds that their interests will not be adequately protected if they do not intervene in the liability phase. Here, defendants may pursue or default to a litigation approach that ESA compliance is, or could be, best accomplished without preserving the Cachuma Users' water supplies, water rights, and other legal rights and obligations, and without providing evidence or making arguments at the liability stage that would support the development of remedies that can accomplish all interests. See, e.g., *Wild Equity Institute v. City and Cnty. of San Francisco*, 2011 WL 2532436, *3 (N.D.Cal.2011) (holding that defendants did not share all of intervenor's interests, and consequently that "defendants may not necessarily be willing to make the

---

12. This conclusion is further supported by the fact that the BOR's temporary modifications to the Project have "compromised the making and measurement of past water rights releases and, if not fixed correctly, threaten future water rights releases." (See Motion to Intervene at 5; see also Dahlstrom Decl. at ¶¶ 17–19). If this is the case, the Cachuma Users have a direct interest in the BOR's current conduct as well as its conduct as this litigation—including the liability phase—progresses.

same arguments as [the intervenor] would. This is true at the liability phase as well as at the remedies stage, and [the intervenor] may be foreclosed from bringing such arguments if it is not permitted to intervene until the liability stage.").

For the reasons stated above, the Cachuma Users satisfy Rule 24(a)'s requirements for intervention as of right. Accordingly, the court need not address the parties' arguments with respect to permissive intervention under Rule 24(b).

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

### *CONCLUSION*

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Motion to Dismiss (**Document No. 17**) is **denied**.

2. Cachuma Users' Motion to Intervene (**Document No. 14**) is **granted**.

3. Plaintiff shall file a **First Amended Complaint** no later than **June 29, 2015** adding the following as defendants: Cachuma Conservation Release Board, Santa Ynez River Water Conservation District, and Santa Ynez River Water Conservation District, Improvement District No. 1.

4. Defendants United States Bureau of Reclamation, Lowell Pimley, United States Department of the Interior, and Sally Jewell shall file their Answer to the First Amended Complaint no later than **July 13, 2015**.

5. Defendants Cachuma Conservation Release Board, Santa Ynez River Water Conservation District, and Santa Ynez River Water Conservation District, Improve-

ment District No. 1 shall file a responsive pleading no later than **July 13, 2015**.